IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 25, 2011 Session

## STEVEN JAMES ROLLINS v. STATE OF TENNESSEE

**Criminal Court for Sullivan County**
**No. C52875   R. Jerry Beck, Judge**

---

**No. E2010-01150-CCA-R3-PD - Filed August 31, 2012**

---

The Petitioner, Steven James Rollins, filed a petition seeking post-conviction relief from his convictions of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. The post-conviction court denied Petitioner relief on all grounds related to the guilt phase of the trial but granted a new sentencing hearing on the grounds of ineffective assistance of counsel. The State is not challenging the grant of a new sentencing hearing. The Petitioner appeals the post-conviction court's ruling denying relief as to the guilt phase of the trial. On appeal, the Petitioner contends that a biased juror served on his jury, that he received the ineffective assistance of counsel because his trial attorneys failed to voir dire potential jurors properly, and that his mental retardation exempts him from the death penalty. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the Petitioner was denied his constitutional rights to a fair and impartial jury and that he received the ineffective assistance of counsel. Therefore, the Petitioner's convictions are reversed, and the case is remanded to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Bradley A. MacLean and Joanne L. Diamond, Assistant Post-Conviction Defenders, for the appellant, Steven James Rollins.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General and Renee W. Turner, Assistant Attorney General; H. Greeley Wells, District Attorney General; and Barry P. Staubus, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

### A. Trial

The Petitioner was convicted in June 2003 of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. The Petitioner and his friend, Gregory Fleenor, planned to rob the victim's bait shop for money to buy drugs. The crimes were carried out overnight on August 21, 2001. Following the convictions of first degree murder, the jury sentenced the Petitioner to death based upon its finding of five aggravating circumstances: (1) the defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; (3) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; (4) the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any robbery, and (5) the victim of the murder was seventy (70) years of age or older. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (6), (7), (14) (1999). The prior violent felony aggravator was found to be invalid by our supreme court on direct appeal. State v. Rollins, 188 S.W.3d 553, 574 (Tenn. 2006). The court held, however, that the jury's reliance on that factor was harmless. Id. The following facts of this case were summarized by the court in its opinion on direct appeal:

> The proof offered by the prosecution at trial established that the defendant, thirty-seven-year-old Steven James Rollins, killed the eighty-one-year-old victim, John Bussell, during a robbery. For thirty years prior to his murder, Bussell owned and operated the Fisherman's Paradise bait shop and barbeque restaurant in the Colonial Heights area of Sullivan County near Kingsport, Tennessee. Bussell, a widower, lived alone in a camper next door to the bait shop. Although Bussell suffered from arthritis, bad eyesight, and breathing difficulties, he had remained active and independent for a person of his age. Local residents were aware that Bussell frequently accommodated customers by opening his business late at night to sell bait or fishing and camping supplies. Furthermore, local residents were aware that Bussell carried large amounts of cash on his person,

at least $1,000 to $1,500 at any given time, according to Walter Hoskins, Bussell's friend of five years and maintenance man. Hoskins recalled that Bussell often displayed this "wad" of cash as he provided change to customers. Hoskins and other of Bussell's friends and relatives cautioned Bussell against opening the bait shop late at night while he was alone and against making change from his "wad" of cash, but to Hoskins' knowledge, Bussell continued to operate his business as he had for the preceding thirty years. Bussell owned and carried a handgun for his protection, and in July 2001, approximately one-month before his murder, Bussell purchased a two-shot Derringer handgun and carried it with him at all times in his right front pants pocket. Hoskins was the last person to speak with Bussell before his murder. Bussell telephoned Hoskins at 10:30 p.m. on August 21, 2001, to discuss Hoskins' plans for the next day.

Ottie McGuire, who had been Bussell's friend for ten years, arrived at the bait shop around 8:30 a.m. on the morning of August 22, 2001, intending to have breakfast with Bussell, as was their custom. McGuire became worried when he noticed that the restaurant lights were off and the door still locked. McGuire walked next door and found the door to Bussell's camper partly open and the morning newspaper still in the box. McGuire knocked on the camper's window and called for Bussell, and when Bussell failed to respond, McGuire went to a nearby fire hall for help, fearing that Bussell had suffered a heart attack.

Eventually Sullivan County Deputy Sheriff Jamie Free arrived at the bait shop. After looking through a window and seeing the victim's head lying on the floor of the bait shop between two display racks, Officer Free removed the chained "closed" sign and kicked open the locked door. Officer Free then found Bussell's body lying in a pool of blood on the floor behind the counter of the bait shop. Bussell was clothed in pajamas and house slippers; his clothing was blood-soaked; and he was not breathing. The cash register was open and empty; the change drawer, also empty, was lying on the floor beside the body. Several minnows and cups used to dip out the minnows

were on floor near the minnow tank. Bussell's Derringer was missing. A trail of bloody footprints led from inside the bait shop to the victim's camper, which had been ransacked. Blood smears were found inside the camper on a variety of the victim's personal belongings. A wad of $1,150 in cash was found lying on the floor of the camper covered by other items.

Forensic experts from the Tennessee Bureau of Investigation Crime Laboratory ultimately spent 112.5 man hours processing the bait shop, the camper, and the area outside but found no physical evidence tying anyone to the crime. The blood found at the scene belonged to the victim. Investigators neither discovered identifiable latent fingerprints nor shoes belonging to a suspect which could be compared to the bloody footprints found at the scene.

An autopsy disclosed that the victim had sustained twenty-seven and possibly twenty-eight knife wounds and had bled to death from these wounds. While most of these injuries would not have been immediately fatal, a deep six-inch cutting wound that began near the victim's left ear and extended across his neck had sliced through his left common carotid artery and jugular vein and would have rendered the victim immediately unconscious and led to his death within four minutes. Another incised wound to the victim's neck had cut into his right jugular vein and would have been fatal without prompt medical care. A third stab wound to the victim's shoulder had penetrated the victim's lung and heart and would also have been fatal without immediate medical care. In addition, Dr. Gretel Harlan Stevens, the forensic pathologist who performed the autopsy, noticed multiple painful but non-life threatening stab wounds to the victim's collarbone, chest, abdomen, back, and hands. Dr. Stevens testified that the [sic] all of these wounds would have been painful, some more than others, but none of these wounds was itself life threatening. Dr. Stevens further explained that the presence of blood on the victim's feet and clothing as well as defensive wounds to his hands indicated that he had been injured but had remained alive and had struggled with and fled from his attacker. Dr. Stevens opined that the nature of the

wounds suggested that the victim initially did a "fairly good job" fending off his attacker, considering his age and health.

Shortly after the victim's murder, Richard Russell, chief investigative officer for the Scott County, Virginia Sheriff's Department, reported to the Sullivan County Sheriff's Department a conversation that he had with the defendant about one month before the murder. In particular, the defendant told Officer Russell that two of the defendant's acquaintances had mentioned robbing "an old guy ... that owned some kind of a bait shop ... and taking his money." At that time, Officer Russell believed that the defendant was referring to a crime that had already been committed. After determining that no such crime had occurred, Officer Russell forgot about the defendant's statement. After learning of the victim's murder, Officer Russell relayed the information to the Sullivan County Sheriff's Department.

On August 25, 2001, the defendant and his girlfriend, Angela Salyers, were interviewed by Sullivan County officers. The defendant agreed to accompany the officers to the Sheriff's Department for questioning. Sullivan County Detective Bobby Russell interviewed the defendant, whom he described as cooperative and responsive. The defendant expounded upon the information he previously had given to the Virginia police, telling Detective Russell that about one month earlier Ricky Frasier, for whom the defendant worked as a roofer, and Larry Cowden, the defendant's co-worker, mentioned going to the trailer of an old man who had a large sum of money and "knocking on the trailer and knocking him in the head. He said he had maybe $40,000.00 or something." The defendant further admitted that, about three weeks earlier, he had accompanied Frasier and Cowden to a drive-in restaurant across the road from the victim's trailer while they watched the victim's trailer, but the defendant denied ever meeting the victim or participating in or knowing anything about the victim's murder.

The police continued to investigate the victim's murder and received information which, on September 26, 2001, resulted in the underwater investigation team of the Sullivan

County Sheriff's Department retrieving Bussell's Derringer from the Holston River. In the meantime, the defendant and Angela Salyers left Tennessee and traveled to a rural area in Michigan's Upper Peninsula, a two-day drive from Sullivan County. On October 9, 2001, Sullivan County officers arrested the defendant and Salyers in Michigan. After receiving Miranda warnings and signing a waiver of those rights, the defendant gave a statement in Michigan admitting that he had killed Bussell. The defendant then waived extradition, and he and Salyers returned to Tennessee with the Sullivan County officers. The group arrived late on October 11, and the defendant then asked to speak with officers "to clear up" some things. Due to the lateness of the hour, the officers delayed meeting with the defendant until October 12. At that time, the defendant gave a second statement recounting his involvement in the robbery and murder of the victim. This second statement was consistent with the first, but provided additional detail.

The substance of the defendant's two statements was that he and Gregory "Kojack" Fleenor were discussing ways to get money to buy cocaine when the defendant suggested robbing the victim. The defendant purchased four pairs of gloves at a convenience store. The defendant, Fleenor, Salyers, and Fleenor's girlfriend, Ashley Cooper, then drove to the victim's bait shop around midnight. The defendant rang the doorbell at the shop. When no one answered, the defendant knocked on the door of the camper. The victim answered, and the defendant told the victim that he needed to buy some bait. The defendant followed the victim into the bait shop, and, while the victim was bent over dipping minnows from the tank, the defendant grabbed the victim's shoulder. When the victim reached for his gun, the defendant pulled a lock-blade knife from his pocket and began stabbing the victim. The defendant could not remember how many times he had stabbed the victim. After the stabbing, the defendant made sure the victim was dead by shaking him, and then the defendant washed his hands and his knife in the minnow tank before joining Fleenor in searching through the victim's camper for money, drugs, and anything else of value. Fleenor found $1,000 to $1,200 in the victim's wallet. The group then drove to Knoxville, where Fleenor purchased

cocaine, which the group consumed. The defendant threw away the victim's wallet and the clothing that the defendant had been wearing when he killed the victim. The defendant also threw the victim's gun into the Holston River. According to the defendant, Fleenor suggested that he kill the victim and that they "leave no witnesses." The defendant insisted that he never intended to kill the victim and that he had been "strung out" on cocaine the entire evening. He concluded his last statement with the admission: "I know I should be punished."

Contradicting both of these statements, the defendant testified at trial that Fleenor had killed the victim. The defendant maintained that he had been afraid of Fleenor and was unaware that Fleenor had planned to rob or to kill the victim. At Fleenor's instruction, the defendant went into the bait shop to buy some bait while Fleenor "checked things out." The defendant left the bait shop after telling Fleenor to pay the victim for the minnows. Fleenor agreed but instructed the defendant to sneak into the camper and steal anything of value he could find. The defendant ransacked the camper for five or ten minutes until Fleenor joined him. When the defendant asked where the victim was, Fleenor responded, "I took care of it." The defendant testified that he thought this meant that Fleenor had hit the victim in the head. Fleenor, however, eventually told the defendant that he had killed the victim by "cutting" him, warned the defendant to keep his mouth shut, and threatened to kill Salyers, Cooper, and members of the defendant's family if the defendant did not keep quiet. The defendant testified that he only had "a little, bitty Old Timer" knife in his pocket while Fleenor had a lock-blade knife. The defendant said that he could not read or write, that he provided the October 9th statement because officers promised that he could ride from Michigan to Tennessee in the same car with his girlfriend, Salyers, and that he had accepted blame for the killing because he was afraid of Fleenor and of Fleenor's father, both of whom were incarcerated with the defendant in the Kingsport jail. The defendant admitted on direct examination that he had fifteen prior felony convictions but pointed out that he had pleaded guilty in each case because he had been guilty. On cross-examination, the defendant intimated that the Sullivan County

investigators had supplied the details of the statements he had given. The defendant explained that he had initialed the erroneous and false written statements because he could neither read nor write with any proficiency. For purposes of impeachment the defendant acknowledged that he had thirteen prior convictions for aggravated burglary from August 1995 to November 1996 and one conviction of felony theft.

Testifying in rebuttal for the State, Detective Bobby Russell, the officer who had taken the defendant's statements, denied supplying the defendant with details concerning the victim's murder. Another officer, Karen Watkins, testified to rebut the defendant's testimony concerning events occurring during the ride from Michigan to Sullivan County. Rana Jandron of the Marquette County Sheriff's Department in Michigan testified that the defendant told her that he could read and write a little bit, "enough to write a letter." A videotape of the defendant's booking in Michigan showing the defendant making this statement was played for the jury. Finally, Angela Salyers, the defendant's girlfriend, testified that the defendant could read and write, that the defendant had owned a lock-blade knife with a four-inch blade at the time of the victim's murder, and that the defendant had attacked and killed the victim. Salyers admitted that she had been tried for first degree murder in connection with the victim's murder and had been convicted of facilitation of robbery.

The jury found the defendant guilty of premeditated first degree murder, felony first degree murder, and especially aggravated robbery.

At the sentencing hearing, the State introduced certified copies of the defendant's two 1996 aggravated assault convictions in Hawkins County, Tennessee. The State also presented photographs of some of the wounds inflicted on the victim. Dr. Gretel Stevens testified at the sentencing phase that none of these injuries had been fatal, that some of these injuries were inflicted while the victim was alive and standing or walking about, and that these injuries would have been painful. The last witness for the State was Marie Carpenter, the victim's

niece, through whom the State presented victim impact testimony. Carpenter testified that the eighty-one-year-old victim had no children and had been a father-figure to her. Carpenter explained that she talked with the victim by telephone every night, saw him weekly, and sometimes drove him to the doctor. The victim had operated his bait shop and barbecue restaurant for thirty years. Although the victim was not in the best of health, he was still able to come and go as he wished. In closing, the State specifically announced that it relied on the proof presented at the guilt phase.

The only mitigation proof offered by the defense was a report by a school psychologist dating from 1978, when the defendant was in his early teens. The report reflected that the defendant's parents were divorced and that the defendant lived with his grandmother. His mother, who had a third-grade education, was not well physically or mentally. No information was available regarding the defendant's father. The defendant's older brother was in the Army. According to the report, the defendant had received speech therapy, was enrolled in vocational training in auto body work, and was repeating the seventh grade. His school grades were mostly Ds and Fs. Teacher comments indicated that he was "basically a non-reader" and could not spell or write. When tested in March 1978, the defendant's I.Q. fell within the borderline defective range, slightly above mentally retarded. The report also noted that the defendant had the academic skills of a second grader. A re-evaluation, performed about six months later, confirmed that the defendant's I.Q. was borderline defective.

Rollins, 188 S.W.3d at 559-64 (footnote omitted). The court affirmed the Petitioner's convictions and sentences. Id. at 577. As noted above, the Petitioner's girlfriend was convicted of facilitation of robbery. Fleenor pled guilty to first degree felony murder and especially aggravated robbery and received concurrent life and fifteen year sentences. See Gregory Christopher Fleenor v. State, No. E2004-00943-CCA-R3-PC, 2005 WL 1412104 (Tenn. Crim. App., June 16, 2005).

## B. Post-Conviction

The Petitioner timely filed his petition for post-conviction relief on December 1, 2006. The post-conviction court appointed the Office of the Post-Conviction Defender, which ultimately amended the pro se petition. The post-conviction court conducted an evidentiary hearing on October 12 through 16, and December 21, 2009, and issued its written order on April 26, 2010. The post-conviction court denied relief on all grounds related to the guilt phase of the trial, but granted the Petitioner a new sentencing hearing on the ground of ineffective assistance of counsel during the penalty phase. The Petitioner is appealing the denial of a new trial. The State, however, is not challenging the granting of a new sentencing hearing. The Petitioner's primary issue on appeal relates to juror bias. This court's summary of the records, therefore, will be limited to the facts surrounding voir dire and the post-conviction testimony concerning juror bias.

Prior to trial, the prospective jurors in this case were given a written questionnaire to complete. The jurors were asked background questions about themselves as well as whether they had any personal or familial interactions with law enforcement or the legal system in general. One of the forty questions in the questionnaire asked if they had "been interested in a specific criminal case in this county." Juror 9's questionnaire was introduced as an exhibit during the post-conviction hearing. Juror 9 did not answer the overwhelming majority of the questions, including the one asking if he had any interest in any particular criminal case.

Juror 9 was in the first panel of prospective jurors called to the jury box. The trial court, as part of its introduction to the prospective jurors, informed the panel that this case was a first degree murder case in which the State filed notice of intent to seek the death penalty. The court told the panel that those jurors who were actually selected to hear the trial would be sequestered for an extended period of time and that the court would impose certain communication restrictions upon them outside of open court. The trial court gave the following initial admonishments to the entire panel, which it said would be applicable throughout the trial of the case:

> You're not to communicate with other jurors or anyone else regarding any subject connected with the trial. Nor should you form or express any opinion thereon until the case is finally submitted to the jury.
>
> You should report promptly to the Court any incident involving an attempt by any person to improperly influence you

or any member of the jury or a violation by any juror of any of
the Court's admonishments.

You should not read, listen to or view any news reports
concerning the case. The case must ultimately be decided solely
and alone upon the evidence that comes in to trial.

In addition, the trial court informed the panel that they would be asked if they had read or heard anything about the case. The court explained that any prospective juror who knew anything about the case would be questioned individually out of the presence of the rest of the panel. The court stated,

So, be very careful to identify yourself if you have read or heard
anything about the case from any source, but do not, at that
moment, tell me what you've read or heard because that way
you have the possibility of, of letting the other jurors know and
we'll be in [sic] a problem if you do that. So, don't state at that
moment what you've read or heard. We will talk with you
individually.

After the court excused a number of prospective jurors from the first panel due to hardships, medical or otherwise, the court swore in the remainder of the panel. Juror 9 was one of twenty-seven prospective jurors remaining on the first panel and was one of the initial eighteen prospective jurors called into the jury box for questioning. The trial court read the presentment of the three charges (first degree premeditated murder, first degree felony murder, and especially aggravated robbery), which stated that the defendant, Steven J. Rollins, along with co-defendants Gregory Christopher Fleenor and Angela Ann Salyers, allegedly killed the eighty-one year old victim, John T. Bussell, by stabbing him and slitting his throat during the coarse of a robbery. The trial court elaborated further as follows:

And if the attorneys would allow me, the allegation is
that Mr. John T. Bussell had a place of business in the Colonial
Heights area down near what used to be called Crooked Road,
now it's called, I believe, Moreland Drive, a fish or a bait shop,
and the allegation is that during the course of the robbery, he
was killed. And I believe that's, again, alleged to be back in
August 21st through the 22nd.

Immediately following those statements, the trial court asked the group of eighteen prospective jurors, including Juror 9, if any of them had read or heard anything about the

case. Of the eighteen jurors in the box, only three jurors, including Juror 9, responded that they had not read or heard anything about the case. The transcript reflects that the trial court questioned each one of the eighteen jurors. The transcript reveals the following when the court questioned Juror 9:

> **THE COURT:** Juror number 9, have you read or heard anything about this?
>
> **[JUROR 9]:** I'm sure I . . . .
>
> **THE COURT:** You haven't. Okay. Juror number 10, have you?

The trial court thereafter examined individually, and outside the presence of the other jurors, each juror who indicated they had read or heard something about the case. Some were excused for cause, including one who knew the victim and believed the defendant should be sentenced to death for his actions. And although the trial court explained to the entire panel that it was going to further question those jurors individually about the extent of their knowledge about the case, Juror 9 did not say anything else and the trial court did not attempt to clarify Juror 9's earlier response.

After the trial court excused five of the eighteen prospective jurors for cause, the court filled the vacancies with five new prospective jurors. In the presence of those eighteen prospective jurors, which included Juror 9, the trial court again read the presentment of the charges to the group, again identifying the name of the victim and the place of the crime, and then asked all of the prospective jurors whether any of them had read or heard anything about the case. All five of the new prospective jurors raised their hand. The court then explained to all of the prospective jurors its practice of inquiring with each juror individually, and outside the presence of the others, about the extent of their knowledge about the case and stated, "The obvious reason we do that if they tell you what you've [sic] read, all of you all will know what they've read or heard and that could have an effect, potentially affect you." Juror 9 exited the courtroom without saying anything. Of those five new prospective jurors, three were excused for cause. One of the two who was permitted to remain on the panel, Juror Brenda J. Depew, knew the victim from her and her husband's patronage of the victim's business, but Ms. Depew stated that she could render a fair and impartial verdict based upon the evidence presented at trial. Ms. Depew ultimately served on the jury in this case.

The trial court filled the three vacancies and, again, read the presentment of the charges which identified the victim by name as well as the location of his business. The trial

court then asked all the jurors if they had read or heard anything about the case. None raised their hand. The court immediately thereafter stated to the prospective jurors, "If we --during the -- further questioning will be asked here shortly, if you should remember something about [the case], raise your hand and let us know and we'll send the other jury matter -- people out." The trial court then asked the eighteen prospective jurors if they knew the parties, attorneys, or some of the potential witnesses listed on the indictment. Two of the prospective jurors said they knew potential witnesses but further stated that they would not place any undue weight on the testimony of those witnesses.

The trial court then proceeded to question the eighteen prospective jurors, including Juror 9, about their views on capital punishment. Prior to delving into specific questions about that topic, however, the trial court asked the jurors once more, "Does anyone presently seated on the jury know of any reason they couldn't sit on the jury and render an absolutely, fair and impartial verdict? Just – if you can [sic] render a [sic] absolutely fair and impartial verdict, let me know right now. All right. Nobody's raised their hand." The trial court then asked the prospective jurors if anyone had a strong opinion one way or the other about the death penalty which would impair their ability to follow the court's instructions on the law and render a fair and impartial verdict based upon the evidence presented. Several jurors raised their hands, and they were further questioned separately about their views. Juror 9, however, remained silent throughout the trial court's questioning of the prospective jurors on this matter.

Prior to the end of the first day of jury selection, the trial court stated the following before excusing the prospective jurors for the night:

> Now, when we come back tomorrow, we'll, we'll continue the voir dire process. Voir dire is a big magic word everybody uses. It just means to tell the truth and it's probably French Renaissance Latin. Just basically means to tell the truth and that's what we call jury selection. So, we'll continue that tomorrow. The attorneys will be asking you questions tomorrow. I think I've carried the burden a little bit here going through some of the preliminaries trying to move things along, but the attorneys will be allowed to ask you questions tomorrow and also ask you questions about these admonitions I've given you.

At the beginning of the second day, the trial court reminded the prospective jurors, including Juror 9, about their obligation to inform the court if they had read or heard anything or had already formed an opinion about the case or whether their views on the death penalty would

impair their ability to reach a fair and impartial decision during sentencing. None of the jurors raised their hand.

After the trial court concluded its general questioning, the attorneys for each side were permitted to pose their own questions to the prospective jurors. The prosecutor summarized the trial process in a capital case and specifically asked each juror if they would be able to follow the law as instructed by the court. Juror 9 responded that he could. Although the prosecutor did not directly ask if any of the jurors knew the victim, he did ask the jurors if they knew the attorneys, the defendant, or either of the co-defendants. None of the jurors responded in the affirmative. After the prosecutor concluded his opening remarks, defense counsel then continued to explain to the jury their general responsibilities as jurors. Defense counsel reminded the prospective jurors, including Juror 9, as follows:

> So, it's real important at this stage of the game that if there's anything that comes to your mind, coming out of any of these questions that have been asked, that suddenly popped into your mind, raise your hand and let's deal with it now because we'd like to try to get twelve (12) jurors with as clean a mindset coming in, that is, free of any preconceived notions or any other, or any other information to come into this, come into this decision-making process as we can.

One of the prospective jurors then raised his hand and, outside the presence of the other jurors, the court questioned this juror about his concerns. While the jurors remained outside the courtroom during this time, two other prospective jurors notified the court officer that they also wanted to express some concerns to the court about their continued service. The court questioned them outside the presence of each other as well as the rest of the prospective jurors. When defense counsel resumed his general questioning of the panel, none of the jurors indicated that they would not be able to render a fair and impartial decision in the case. In the presence of the entire panel, including Juror 9, defense counsel questioned three prospective jurors about answers they entered on the written questionnaire. The answers related to the several jurors' knowledge of either someone in law enforcement or one of the potential witnesses in the case. Juror 9 remained silent during these inquiries.

Before and after each recess when the jury was excused from the courtroom during the selection process, the trial court reminded the jurors of the admonishments previously given about not reading or watching the news, not communicating with anyone about the case, not prematurely forming an opinion, and reporting any improper outside influences. Following the exercise by the attorneys of their peremptory challenges, the parties and court accepted a jury of twelve (plus two alternates), which included Juror 9. During the trial of

the case, each time before the jury was excused from the courtroom and after they were reseated in the jury box, the trial court read them the list of the admonishments noted above, including the prohibitions against discussing the case with anyone at all or forming an opinion prior to deliberations, and then inquired whether any of the jurors had anything to report. Each time, Juror 9 remained silent.

In his post-conviction petition, the Petitioner claimed that Juror 9 did not give thoroughly honest responses to questions asked during the jury selection process and improperly discussed the case with at least one other person after he was sworn in as a member of the jury and prior to deliberations. Specifically, the Petitioner contends Juror 9 failed to disclose to the court his friendship with the victim and his views on capital punishment and talked about the case with his juror roommate prior to deliberations. In support of his claim, the Petitioner introduced two affidavits signed by Juror 9 and called Juror 9 as a witness to testify at the evidentiary hearing.

The following affidavit was signed by Juror 9 on August 6, 2008:

> I, [Juror 9's name], having been duly sworn, state: I served on the Steve Rollins jury. The jury agreed on death in one vote. I had known the victim Mr. Bussell and bought bait from him about once a week. We could not talk about the case with other jurors except for my roommate and we talked about it and both agreed. I had my mind made up as soon as they seated the jury. I could tell by looking at him that he was a crook. I believe that death is the only appropriate punishment for someone convicted of murder, but no one asked me about my opinion.

The affidavit appears to have been handwritten by someone other than Juror 9 because his last name is misspelled. The signature, however, reflects the correct spelling of his last name. The second affidavit was signed by Juror 9 on October 10, 2009, and states as follows:

> I, [Juror 9's name], having been duly sworn, state: I knew Mr. Bussell for one year from buying fishing equipment. We were friends and I would visit his shop at least once a week. I heard that he had been murdered on the night he was killed. I said to myself, "If I catch him, I'll kill him.["] He cut his throat, he deserved to die. Everyone was upset about the murder and talking about it. It was on the news and in the newspaper. I read about the arrests the whole time. I knew as soon as I seen

him that he was guilty. I knew he was going to burn. Death is always appropriate when you kill someone – automatically it's the only appropriate punishment. I talked to my roommate about the case. I told him I knew Bussell and asked him how he felt about it. He said, "We should burn him." Everybody agreed he was guilty and deserved to die. We said he took a life and deserved to lose his life. Nobody ever asked me how I felt about the death penalty. I thought he deserved to die then, and I still feel that way now. After we found him guilty and gave him death, the judge let us leave. He thanked us for what we had done and we all felt good about it.

It appears the second affidavit is in a handwriting style different than the first one. Juror 9's signature appears to be the same, however.

At the time of the hearing, Juror 9 was eighty years old. During his post-conviction testimony, Juror 9 affirmed that each statement contained in the two affidavits was true. Juror 9 testified he would have informed the court during voir dire that he was a friend of the victim and saw him about once a week if he had been asked. He also testified that, if asked during voir dire, he would have informed the court at that time that he felt the Petitioner deserved to die for his actions. Juror 9 stated he was able to hear and understand everything that was said during the jury selection process.

During cross-examination by the State, Juror 9 acknowledged he had difficulty hearing and had had the problem for "[q]uite a while." When asked if he owned a hearing aid, Juror 9 did not respond clearly. At first, he stated that he did not possess a hearing aid, but when asked if he had access to a hearing aid when he was interviewed and asked to sign the affidavits prior to the hearing, he stated, "I don't know. I'll be honest with you, I don't' know." Juror 9 then later testified that he never owned a hearing aid.

Juror 9 testified during cross-examination that he believed the Petitioner received a fair trial. He also testified that he would have voted "not guilty" if he had thought the State did not prove its case-in-chief. When asked if he would have voted for the death penalty if the evidence did not support it, Juror 9 initially responded, "No, I'd – I'd – I'd give him a debt [sic], and I still would." The State then asked, "But if you didn't think that the evidence justified giving him a death sentence, would you give him the death penalty?" Juror 9 replied, "No." Juror 9 also testified that if he was asked during voir dire if he had read or heard anything about the case he would have responded in the affirmative. Juror 9 further testified that he did not offer to the court any reason why he would not be able to render a fair and impartial verdict. The following exchange between the State and Juror 9 then took place:

**Q.** Do you recall whether anyone asked you whether or not you knew [the victim]?

**A.** Yeah.

**Q.** Did they? Did somebody ask you that?

**A.** Yeah.

**Q.** Did you respond to it?

**A.** Yeah.

Juror 9 testified that he heard about Mr. Bussell's murder in the news. Although Juror 9 stated in his second affidavit that he "heard that he [the victim] had been murdered on the night he was killed," he acknowledged during the hearing that he could not have heard about it that same night because the victim's body was not discovered until the next day. The State's cross-examination of Juror 9 concluded with the following exchange:

**Q.** Who came out and asked you these questions on these affidavits?

**A.** I don't know. That's been a long time.

**Q.** Who did they tell you they were?

**A.** I – I don't know. I'll be honest with you.

**Q.** Who did they tell you they worked for?

**A.** The county.

**Q.** The county? Okay. Did you think they worked for me?

**A.** Huh?

**Q.** Did you think they worked for me?

**A.** I don't know.

**Q.** Did you think they worked for the sheriff?

**A.** Possibly.

**Q.** You said it's been a long time ago. The two-page one says that you were sworn to it on October the 10th of 2009, which would have been last Friday.

**A.** Yeah.

**Q.** You don't remember who came out to see you last Friday?

**A.** No.

**Q.** When whoever it was came out and asked you these things and wrote down these affidavits, did they show you the transcript of the questions that were asked of you at the trial?

**A.** I don't know. I'll be honest with you.

**Q.** Well, you see this – these volumes of paper that I'm handing up?

**A.** Yeah.

**Q.** Looks --- what? --- about four or five inches thick. Did they show you anything like this when they came out and asked you the questions?

**A.** Well, they – they just asked me to sign the affidavit that the – of the questions they asked.

**Q.** Okay. But your answer is: They didn't show you what questions were asked of you by the judge or by the lawyers at the trial, did they?

**A.** Yeah.

**Q.** They didn't show you this stuff, did they?

**A.** No.

On redirect examination, Juror 9 again testified that the affidavits he signed were completely truthful. He further stated that he would have never considered the possibility of any sentence other than death following the guilty verdict. After Juror 9 was excused from the witness stand, the post-conviction court and counsel briefly discussed the fact that no one specifically asked the prospective jurors during voir dire if any of them actually knew the victim of the crime in this case.

The post-conviction court concluded that the Petitioner did not carry his burden of proof on the juror bias claim. In arriving at its conclusion, the court recounted the fact that the prospective jurors were asked during voir dire if they knew anyone involved in the case or had read or heard anything about the case. The court acknowledged the fact that Juror 9 remained silent during this line of questioning and did not alert the court about his friendship with the victim or any pretrial exposure he may have had about the crimes. The post-conviction court pointed to the fact that the transcript of the jury selection process does not clearly reflect whether Juror 9 ever finished his response when the court asked him directly if he had read or heard anything about the case. The post-conviction court apparently did not have any independent recollection of that particular exchange.[1] In addition to the numerous publicity-type questions, the post-conviction court recounted the fact that the prospective jurors were also repeatedly asked if any of them harbored any personal opinions about capital punishment which would prevent or substantially impair their ability to render a fair and

---

[1] The record reflects that the same judge presided at trial and the post-conviction evidentiary hearing.

impartial decision based on the instructions given during the penalty phase of the trial. The court recognized that Juror 9 remained silent throughout this line of questioning as well.

The post-conviction court observed that Juror 9 testified during the post-conviction hearing that each of the statements in the two affidavits he signed were true. The court also noted that Juror 9 testified that he was never asked if he knew the victim but that he would have informed the court of his friendship if he had been asked about it. In addition, the court noted that Juror 9 testified that if he had been asked his opinion about the death penalty he would have said he thought the Petitioner deserved to die. As to the truth of the affidavits and Juror 9's testimony that he was never asked if he knew the victim or his views on capital punishment, the court concluded, "This portion of the testimony, which this Court deemed credible and which was solicited by the Petitioner, does not support willful concealment or failure to disclose the fact that the juror knew the victim or regarding his death penalty views."

The post-conviction court also quoted from the transcript of the evidentiary hearing the majority of the prosecution's cross-examination of Juror 9. Based upon that line of questioning, the court concluded that "Juror [9]'s testimony established that he has a hearing problem and it also established that the witness may have been confused at the hearing about the subjects he was discussing to a substantial degree and that clearly calls his recollection and, thus, his credibility into question." The court also commented that "issues such as age, hearing, and wording of questions may have contributed to this juror's failure [during voir dire] to clearly and properly express his relationship with the victim, his views about the death penalty, and other matters."

The post-conviction court concluded as follows:

When considering the record as a whole, this Court does not find that the Petitioner has carried his burden of proof on the issues related to Juror [9]. This Court finds that Juror [9] credibly stated that he would answer questions honestly if asked and that the Juror wanted to be forthright with the Court, but this Court further finds that this Juror's ability to recall both the recent and distant past are at best questionable. When asked about it, he could not recall the events related to the taking of his affidavit only one week before the hearing. He clearly answered questions in a confused manner as is evidenced by the transcript and this Court's observation of the Juror.

This Court does not find credible evidence in this record of any willful concealment or failure to disclose information by this juror. Accordingly, there is no presumption of prejudice. Without a presumption of prejudice, the Petitioner has failed to carry his burden of proof on the issue of prejudice. As stated previously, this Court finds credible the Juror's statements that if the evidence had not been presented to him that he would not have reached the same verdict.

## II. Analysis

The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. See Tenn. Code Ann. §§ 40-30-101 to -122. To obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App.1998).

Once the post-conviction court rules on the petition, its findings of fact are conclusive on appeal unless the evidence preponderates against them. State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn.1999)); Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993). The Petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

### A. Juror Bias

The Petitioner argues that Juror 9's participation on the jury violated his constitutional rights to a fair and impartial jury and that the post-conviction court's analysis of the issue was erroneous. Specifically, the Petitioner argues that because Juror 9 failed to disclose his friendship with the murder victim in this case, a presumption of bias is established which has not been overcome.

Both the United States and the Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In Tennessee, challenges to juror qualifications generally fall into the following two categories: propter defectum, "on account of defect," or propter affectum, "on account of prejudice." See State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). General disqualifications based on alienage, family relationship, or some other statutory mandate are classified as propter defectum and must be challenged before the return of a jury verdict. Id. An objection based upon bias, prejudice, or impartiality is classified as propter affectum and may be made after the jury verdict. Id. A claim of juror bias or impartiality may, therefore, be asserted in a petition seeking post-conviction relief. See Carruthers v. State, No.W2006-00376-CCA-R3-PD, 2007 WL 4355481 (Tenn. Crim. App., Dec. 12, 2007), perm. to app. denied, (Tenn., May 27, 2008).

In Akins, this court aptly summarized the law on juror bias in Tennessee, stating,

The jury selection process must be carefully guarded to ensure that each defendant has a fair trial and that the verdict is determined by an impartial trier of fact. The Tennessee Constitution guarantees every accused "a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation". Toombs v. State, 197 Tenn. 229, 270 S.W.2d 649, 650 (1954).

Bias in a juror is a "leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; [a] bent; [for] inclination." Durham v. State, 182 Tenn. 577, 188 S.W.2d 555, 559 (1945). Jurors who have prejudged certain issues or who have had life experiences or associations which have swayed them "in response to those natural and human instincts common to mankind," id. 188 S.W.2d at 559, interfere with the underpinnings of our justice system.

The essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel. 47 Am.Jur.2d, Jury § 195 (1969). Traditionally, our state had shown great respect and deference to the voir dire process. Our legislature had given parties in criminal and civil cases "an absolute right to examine prospective jurors." Tenn. Code Ann. § 22-3-101 (1980 Repl.). Our courts, both civil and criminal,

have long recognized the importance of the voir dire process and have zealously guarded its integrity. See e.g., Hyatt v. State, 221 Tenn. 644, 430 S.W.2d 129 (1967); Toombs v. State, 270 S.W.2d 649 (Tenn. 1954); Durham v. State, 188 S.W.2d 555 (Tenn. 1945); Owen v. Arcata Graphics/Kingsport Press, 813 S.W.2d 442 (Tenn. App. 1990), perm. to appeal denied, (Tenn.1991); State v. Furlough, 797 S.W.2d 631 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1990); State v. Pender, 687 S.W.2d 714 (Tenn. Crim. App. 1984), perm. to appeal denied, (Tenn. 1985); Tennessee Farmers Mut. Ins. Co., v. Greer, 682 S.W.2d 920, 924 (Tenn. App.), perm. to appeal denied, (Tenn. 1984); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983), perm. to appeal denied, (Tenn. 1984). Since full knowledge of the facts which might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and cause challenges, jurors are obligated to make "full and truthful answers . . . neither falsely stating any fact nor concealing any material matter." 47 Am.Jur.2d, Jury § 208 (1969).

    . . . .

[A] defendant bears the burden of providing a prima facie case of bias or partiality. See State v. Taylor, 669 S.W.2d 694, 700 (Tenn. Crim. App. 1983), perm. to appeal denied, (Tenn. 1984). When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises. Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945). Silence on the juror's part when asked a question reasonably calculated to produce an answer is tantamount to a negative answer. 47 Am.Jur.2d § 208 (1969) (counsel has right to rely on silence as negative answer); see Hyatt v. State, 430 S.W.2d 129, 130 (Tenn. 1967) ( "[j]uror . . . by his silence . . . acknowledged"). Therefore, failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality, Hyatt v. State, 430 S.W.2d 129 (Tenn. 1967); Toombs v. State, 270 S.W.2d 649 (Tenn. 1954); Durham v. State, 188 S.W.2d 555 (Tenn. 1945), "the theory being that a prejudicial bias has been

implanted in the mind which will probably influence the judgment." 188 S.W.2d at 558.

867 S.W.2d 350, 354-56 (Tenn. Crim. App. 1993) (footnotes omitted). See also Smith v. State, 357 S.W.3d 322, 348 (Tenn. 2011) (citing Akins with approval). As this court observed, the question posed to the prospective juror "must be material and one to which counsel would reasonably be expected to give substantial weight." Akins, 867 S.W.2d at 356 n.12. "The test is whether a reasonable, impartial person would have believed the question, as asked, called for juror response under the circumstances." Id. n.13. Moreover, the intent of the juror is not dispositive of the issue of bias. Id. n.15.

> [W]hen a juror's response to relevant, direct voir dire questioning, whether put to that juror in particular or to the venire in general, does not fully and fairly inform counsel of the matters which reflect on a potential juror's possible bias, a presumption of bias arises. While that presumption may be rebutted by an absence of actual prejudice, the court must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality, to determine whether the presumption is overcome. Moreover, when the presumed bias is confirmed by the challenged juror's conduct during jury deliberations which gives rise to the possibility that improper extraneous information was provided to the jury, actual prejudice has been demonstrated.

Id. at 357.

Our supreme court has recognized that "proper fields of inquiry [into a juror's bias or partiality] include the juror's occupation, habits, acquaintanceships, associations and other facts, including his [or her] experiences, which will indicate his [or her] freedom from bias." Smith, 357 S.W.3d at 347 (first brackets added; emphasis added; internal quotations omitted). In Smith, a capital post-conviction case, the petitioner challenged his trial counsel's failure to question prospective jurors about their past experiences either as a victim or with a victim of a criminal act. Id. at 335. The record in that case reflected that no one, neither the trial court nor the attorneys, asked the jurors whether they knew anyone who had been the victim of a crime. Id. at 346. One of the jurors revealed during the post-conviction hearing that his daughter's boyfriend had been murdered shortly before the trial. Id. Our supreme court held that trial counsel's failure to question the prospective jurors about any of their experiences with crime victims was deficient performance under the circumstances. Id. at 348. The court concluded, however, that Smith failed to prove any resulting prejudice

from the deficient performance because he did not show actual bias on the part of the juror. Id. The court noted that the juror informed the trial judge there was no reason he could not give the defendant a fair trial. Id. Nevertheless, Smith argued that the juror's bias should have been presumed. Id. The court noted, however, that because the jurors were never directly asked questions about any experience with crime victims, the juror at issue did not willfully conceal his history. Id. The court cited cases addressing presumptions of bias where jurors concealed prior involvement as prosecuting witnesses in similar cases or close personal or familial relationships with a party to the case, but it stated that it has "never presumed bias absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias." Id. (emphasis added).

In Akins, the defendant was charged with vehicular homicide, driving under the influence of an intoxicant, and driving on a revoked license. 867 S.W.2d at 352. One of the trial jurors had previously worked as a probation officer, a DUI probation counselor, and at a hospital in an alcohol and drub rehabilitation program. Id. at 353. The juror, however, did not disclose any of that information during jury selection despite being asked straightforward questions about any experiences working with or counseling alcoholics, connections with DUI cases, or employment in law enforcement. Id. at 353-54. Moreover, the juror discussed her work history with other jurors during deliberations by telling them that she "knew what alcoholics were like." Id. at 354. This court ruled that not only had a presumption of bias been raised but that the defendant had proven actual bias because the juror discussed her experiences involving alcoholics and law enforcement during deliberations. Id. at 357.

In Bowman v. State, one of the jurors revealed during voir dire that she knew one of the two prosecuting attorneys in the case and was friends with his ex-wife. 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980). This court recognized that a juror's failure to disclose a close personal relationship with the victim of a crime could result in juror bias. Id. at 812 (citing Hyatt v. State, 430 S.W.2d 129 (Tenn. 1976); Toombs v. State, 270 S.W.2d 649 (Tenn. 1954); Durham v. State, 188 S.W.2d 555 (Ten. 1945)). The defendant in Bowman, however, did not challenge the juror at issue for cause or strike her peremptorily after she revealed her relationship with one of the parties. Id. This court held that there was full disclosure by the juror, that the juror was not legally disqualified, and that the defendant failed otherwise to establish any bias. Id.

In Carruthers, another capital post-conviction case, the defendant's mother and brother testified during the post-conviction hearing that they recognized one of the trial jurors as their neighbor. The juror in question also testified during the hearing. He stated that although someone mentioned that the defendant's mother was present during trial, he further testified that he did not remember recognizing any of the courtroom spectators as being one of his

neighbors. At the conclusion of closing arguments during the guilt phase, the trial court informed the parties that the juror in question was possibly a neighbor of the defendant's mother. Id. at 44-45. According to the information imparted to the trial court, however, the defendant's mother did not know the juror personally and only recognized him as a neighbor on her street. Id. at 45. Neither of the parties requested to voir dire the juror and neither objected to his continued presence on the jury. Id. at 46. During the penalty phase of the trial, defense counsel moved for a mistrial because they had since learned that the juror in question lived only two doors down from the defendant's mother. Id. The trial court denied the request based on the fact that no evidence had been introduced to suggest that the juror was prejudiced against the defendant or his family. Id.

On appeal of the denial of post-conviction relief, Carruthers argued the fact that the juror lived on the same street as his mother raised a presumption of bias. Id. at 47. In denying relief, this court stated that there was no allegation that the juror failed to disclose any association with the defendant's family during jury selection or that any question was asked that should have triggered such a response from him. Id. at 48. This court held that the proof did not establish that the juror recognized the defendant or that he was biased against the defendant or his family. Id. This court noted that "'Tennessee courts have routinely refused relief in post-verdict propter affectum challenges in cases where there was a casual relationship not disclosed during voir dire or the record failed to reveal an inherently prejudicial relationship or a false answer.'" Id. (quoting State v. Joseph Angel Silva, III, No. M2003-03063-CCA-R3-CD, 2005 WL 1252621 (Tenn. Crim. App., May 25, 2005), perm. to app. denied, (Tenn. Oct. 17, 2005)) (emphasis added).

In Silva, one of the jurors was the aunt of the former girlfriend of the defendant's brother. 2005 WL 1252621 at *3. At the time of trial, the former girlfriend and the defendant's brother had difficulty over visitation and child support issues. Id. During voir dire, the jurors were specifically asked if they knew the defendant's brother because he was a potential witness at trial. Id. The defendant's brother was not present during voir dire. Id. The juror in question did not recognize the name (her niece twice in passing introduced her to the defendant's brother, not by name, but only as her "boyfriend"), and thus did not respond to the question during voir dire. Id. Later during a recess in trial, however, the juror recognized the defendant's brother in the hallway. Id. She did not alert anyone to that fact, though, because she said it did not affect her verdict. Id. at *4. During the motion for new trial, the defendant argued juror bias based on the juror's knowledge of his brother. Id. at *3. In affirming the denial of the motion on this ground for relief, this court noted on appeal that the evidence did not reveal "anything approaching a close familial relationship" between the juror and her niece. Id. at *7. This court also noted that the evidence demonstrated that the juror did not know the defendant's brother by name and only had a "casual acquaintance" with him. Id.

-25-

This court in Silva discussed a similar issue that was raised on appeal in State v. Sammy D. Childers, No. W2002-00006-CCA-R3-CD, 2003 WL 214444 (Tenn. Crim. App., Jan. 30, 2003), perm. to app. denied, (Tenn., May 27, 2003). During voir dire in Childers, the prospective jurors were asked if they knew anyone involved in the case, including the names of the two victims. Id. at *1. The juror in question did not respond. Id. The defendant thereafter alleged juror bias in his motion for new trial. Id. The defendant apparently learned from one of the victims that the juror in question did in fact know the other victim. Id. During the hearing on the motion for new trial, the juror in question testified that she did not alert anyone to the fact that she knew one of the victims because she did not believe it would have affected her judgment. Id. The juror further testified that she was an acquaintance of one of the victims in that he was a best man in her friend's wedding and that she was on the same boat with him during an outing one time. Id. She stated, however, that the victim was not a good friend of hers. Id. This court held that the "uncontroverted proof" revealed that the juror "did not have a close acquaintanceship with the victim." Id. at *3. The court quoted the following comments made by the trial court on the issue: "[in small counties], we could not try a lawsuit where someone didn't have a passing acquaintanceship with someone. Nothing wrong with knowing someone unless that might cause you to treat the lawsuit differently or to not be able to be completely fair to both sides." Id. (emphasis added). Finally, this court stated that "[w]e are not at liberty to reverse the trial court's finding unless the evidence clearly preponderates against the court's conclusion that [the juror] was not biased or partial." Id.

In State v. George Arthur Lee Smith, No. E2006-00984-CCA-R3-CD, 2007 WL 4117603 (Tenn. Crim. App., Nov. 19, 2007), perm. to app. denied, (Tenn., Feb. 25, 2008), the defendants were convicted of first degree murder and sentenced to life in prison. In their motions for new trial, the defendants alleged that one of the jurors failed to disclose that he knew one of the potential witnesses, failed to disclose that he worked as a plumber for one of the defendants, and failed to disclose that his daughter worked in law enforcement. Id. at **28-29. This juror did not answer the question in the written juror questionnaire asking whether he had family members who worked in law enforcement even though his daughter worked in that field. Id. at *26. During trial, based upon information imparted to it, the trial court questioned this particular juror about whether he knew one of the potential witnesses. Id. The juror responded in the negative. Id.

Although the defendants in Smith, presented evidence in the motion for new trial that this juror's niece had two children by someone with the same name as the potential witness and that the juror had been seen at family functions with the potential witness, the trial court accredited the juror's testimony that he did not know the potential witness. Id. at *28. This court concluded on appeal that the defendants did not prove that the juror actually knew the potential witness. Id. This court also observed that the potential witness did not testify at

trial. Id. As to the juror's alleged employment with one of the defendants, this court noted that the juror did not testify concerning the matter and that the defendants otherwise failed to show how the alleged employment affected the juror's partiality. Id. Finally, this court stated that an alleged relationship between a juror and someone in law enforcement "does not give rise to an inherently prejudicial situation in and of itself" and that there was no evidence in the record proving that the juror's daughter's employment in the field resulted in actual partiality. Id. at *29. Under the totality of the circumstances, therefore, this court held that the defendants failed to show a presumption of bias on the part of the juror in question. Id. at **28-29.

In State v. Randall S. Sparks, No. M2005-02436-CCA-R3-CD, 2006 WL 2242236 (Tenn. Crim. App., Aug. 4, 2006), the defendant claimed in his motion for new trial that one of the trial jurors was biased because she failed to reveal during voir dire that she knew the defendant and members of his family. It is unclear from the opinion what questions were asked prospective jurors during voir dire, but the opinion reflects that the defendant was identified by name and asked to stand up in front of the jurors. Id. at *7. The juror in question managed an apartment complex where the defendant and members of his family had lived. Id. at **5-6. The juror revealed this fact during voir dire, however, and also stated that she was "close" with many of the residents. Id. at *7. The juror testified during the hearing on the motion for new trial that she only had a "passing acquaintance" with the defendant but that she did not realize this fact until the middle of trial when his wife's name was mentioned. Id. The names of the defendant's wife and mother were not mentioned during voir dire. Id. On appeal, this court concluded that, under the circumstances, any presumption of prejudice was rebutted. Id.

In Hyatt, one of the jurors knew one of the defendants but did not realize this fact until deliberations when another juror referred to the defendant by her former name which was the name by which the juror in question knew her. 430 S.W.2d at 129. This juror had previously procured a search warrant against one of the defendants' residences in hopes that the defendant would quit selling whiskey to the juror's son-in-law. Id. Although there appears to have been no willful concealment of the juror's knowledge of the defendant, our supreme court held that "the constitutional guaranty of trial by an impartial jury requires the jury be free of even a reasonable suspicion of bias and prejudice." Id. The court stated that the record supported a finding that the juror "was at least hostile to the defendant." Id.

Finally, in Toombs, one of the trial jurors was a first cousin of the prosecutor's wife but did not reveal this fact to the court or attorneys prior to trial. 270 S.W.2d at 650. Although the jurors were not asked during voir dire whether they were related to any of the attorneys or the defendants, they were asked if they knew any reason why they could not give both sides a fair trial. Id. Our supreme court concluded that the defendants had established

juror bias and granted them a new trial. Id. at 651. The following excerpts from the Toombs opinion, which were alluded to by this court in Akins, are germane to the very issue now before this court and bear repeating in full:

> Now [the juror in question] necessarily knew that his close kinship with the prosecutor's wife was a fact that should be revealed to these defendants, particularly after there had been addressed to him the question as to whether he knew of any reason which might prevent him from giving both sides a fair trial. His failure under these circumstances to reveal this kinship almost forces the conclusion that he was animated by an ulterior motive in remaining silent, and that this ulterior motive stemmed from a partiality in favor of the prosecution and, by the same token, a bias against these defendants.
>
> . . . .
>
> When attorneys for [the defendants] inquired as to whether this juror knew of any reason why he could not give these defendants a fair trial, that inquiry clearly indicated to the mind of a fair and reasonable man that the question required revelation of the fact that the prospective juror was very close kin to the prosecutor's wife. His failure in this respect justifies the conclusion that he had a purpose unfavorable to [the defendants] in withholding that information.
>
> . . . .
>
> And, while it is a fact that it would have been much better practice for the defendants to have specifically asked the juror as to any kinship with the parties, nevertheless, in view of the question which the defendants did put to the prospective juror, we are not able to conclude that the defendants were guilty of such negligence as to deprive them of their right to a new trial in a case in which there sat in judgment on them a juror who withhold [sic] from them the fact that he was a first cousin and close friend to the wife of the man who was seeking their conviction at the hands of this jury.

Id. at 650-51.

These cases illustrate what Akins demands of prospective jurors as well as the courts reviewing claims of juror bias and impartiality: "[F]ailure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality," and "[w]hile that presumption may be rebutted by an absence of actual prejudice, the court must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality, to determine whether the presumption is overcome." 867 S.W.2d at 356-57. In addition, this court is bound by certain maxims in its review of the post-conviction court's ruling in the post-conviction context. Specifically, the post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates against them, Nichols, 90 S.W.3d at 586, this court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court, id., and the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court, Bates, 973 S.W.2d at 631. Moreover, a petitioner is required to satisfy the factual allegations in support of his ground for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f). With this backdrop in mind, we will review the issue at hand.

The transcript of the voir dire demonstrates that the jurors in this case were repeatedly asked to state whether they had heard or read anything about this case or whether they knew the attorneys, the parties, or anyone on a list of potential witnesses. The trial court specifically asked the jurors if "anyone presently seated on the jury know[s] of any reason they couldn't sit on the jury and render an absolutely, fair and impartial verdict." Juror 9 remained silent throughout this line of questioning. In its post-conviction order, the post-conviction court stated that "issues such as age, hearing, and wording of questions may have also contributed to this juror's failure to clearly and properly express his relationship with the victim." As the trial record reflects, however, Juror 9 did not express his relationship with the victim at all, much less "clearly and properly." The post-conviction court specifically stated in its post-conviction order that it deemed credible Juror 9's testimony that he would have revealed his friendship with the victim if he had been asked whether he knew the victim. The post-conviction court did not, however, discount the fact that Juror 9 was friends with the victim. Nor did the State introduce any evidence to rebut this fact. The record clearly demonstrates, therefore, that Juror 9 was friends with the victim. The question now becomes whether a presumption of bias arose when Juror 9 did not disclose this fact during voir dire or at any other time prior to the return of the jury's verdict.

The post-conviction court stated that Juror 9's "age, hearing, and wording of questions may have" caused him not to disclose his friendship with the victim. Although the court found that Juror 9 had difficulty hearing and understanding questions asked during the post-conviction hearing, there is nothing in the record to establish that Juror 9 was unable to hear everything that was said during trial. To the contrary, Juror 9 testified during the evidentiary

hearing that he heard and understood everything that was said during the jury selection process. The post-conviction court's suggestion that Juror 9 may not have disclosed his friendship with the victim due to his age, hearing loss, or the style of the questions is simply unfounded. Based upon our review of the totality of the circumstances, this court must conclude that a presumption of bias arose when Juror 9 failed to disclose his friendship with the victim in response to the nature of the questions that were repeatedly asked during voir dire. Juror 9's friendship with the victim entailed weekly visits for about one year. The court does not consider this type of relationship a casual or passing acquaintance. Cf. supra Carruthers, Silva, Childers, and Sparks. Instead, a juror who was friends with the murder victim in the case in which he is a prospective juror is the very classic type of relationship which "give[s] rise to an inherently prejudicial situation in and of itself." Smith, 2007 WL 4117603; see Carruthers, 2007 WL 4355481 at *48; Silva, 2005 WL 1252621 at *6. See also Bowman, 598 S.W.2d at 812 (failure to disclose close personal relationship with the victim of a crime could result in juror bias). Juror 9, however, did not say anything about his friendship with the victim during voir dire. "When jurors fail to disclose relevant, potentially prejudicial information, counsel are hampered in the jury selection process." Akins, 867 S.W.2d at 357. One of the other prospective jurors in this case informed the trial court that she knew the victim and she was subsequently excused because of that fact.

"The test is whether a reasonable, impartial person would have believed the question, as asked, called for juror response under the circumstances." Id. at 356 n.13. There is no doubt that the jurors in this case were not specifically asked if they knew the victim. The post-conviction court even seemed surprised about this fact during the post-conviction proceeding. The trial court did, however, read the charges against the defendant to the prospective jurors, including Juror 9, more than once and specifically identified the victim by name. Furthermore, as noted above in the summary of the jury selection process, the trial court and counsel repeatedly asked the jurors if they had read or heard anything about the case. This court must conclude that any reasonable juror would interpret the phrase "anything about the case" to include knowledge of the victim. After reviewing the transcript of the entire jury selection process, this court further concludes that the questions asked were reasonably calculated to solicit any juror's personal knowledge of the victim. In fact, at least three different jurors informed the court that they either knew the victim or his place of business where the crimes occurred. "[W]e must demand of all participants in the justice system appropriate candor and conduct if the system itself is to maintain a position of dignity and respect." Id. at 357.

In its post-conviction order, the post-conviction court did not comment on the nature of the relationship between Juror 9 and the victim. The court instead offered a passing explanation about why Juror 9 may not have disclosed the friendship. The court concluded, however, that Juror 9's testimony, that he would have informed the court that he knew the

victim if asked, "which this Court deemed credible and which was solicited by the Petitioner, does not support willful concealment or failure to disclose the fact that the juror knew the victim." This court disagrees. Again, the credibility of the witnesses and weight and value to be given their testimony are solely within the post-conviction court's purview. The post-conviction court found some of Juror 9's testimony credible and some not. As evidenced by the post-conviction court's own affirmation, the testimony relating to the matter of Juror 9's friendship with the victim, however, was not called into doubt. The fact that Juror 9 testified that he was never directly asked if he knew the victim, when indeed he was not, supports his testimony that he heard everything that was said during the jury selection process. According to the post-conviction court, "This Court finds that Juror [9] credibly stated that he would answer questions honestly if asked and that the Juror wanted to be forthright with the Court."

As part of the juror bias claim he presented in his written petition, the Petitioner alleged that Juror 9 was not truthful in responses to questions asked during voir dire about his views on the death penalty. During the evidentiary hearing, Juror 9 was questioned if he had any preconceived notions about the punishment in this case. In its order, the post-conviction court noted that Juror 9 seemed confused by some of those questions and, thus, questioned his credibility in that respect. The court also questioned Juror 9's credibility in responses he gave to the questions about his hearing problem as well as other recent events that occurred in his life. The post-conviction court commented generally on Juror 9's advanced age and trouble hearing at the time of the evidentiary hearing. However, outside of his claim of bias because of Juror 9's friendship with the victim, the Petitioner does not raise as an issue on appeal anything related to Juror 9's views on the death penalty. As such, the post-conviction court's finding that some of Juror 9's testimony was not credible does not affect this court's analysis of the bias issue with respect to Juror 9's failure to disclose his friendship with the victim, especially when the post-conviction court found that portion of Juror 9's testimony to be credible.

The totality of the circumstances surrounding the voir dire in this case demonstrates that Juror 9 failed to disclose his friendship with the victim, and there is nothing in the record to overcome the presumption of this bias. The circumstances of this case can readily be distinguished from those circumstances in each of the cases discussed above wherein the courts concluded there was no constitutional violation regarding juror bias or partiality. Furthermore, while Juror 9 may not have willfully concealed his friendship with the victim, he most definitely failed to disclose that fact to the court. Akins reminds us that the intent of the juror is not dispositive of the issue. 867 S.W.2d at 356 n.15. Juror 9's failure to disclose his friendship with the victim of the murder trial on which he was about to sit as a member of the jury was inexcusable. It is difficult to imagine a situation in which a reasonable juror would not think his or her friendship with the murder victim of the case is not a material fact which should not be imparted to the court and parties. As our supreme

court recently recognized, "the failure to ask the prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable." Smith, 357 S.W.3d at 347. The post-conviction court accredited Juror 9's testimony "that if the evidence had not been presented to him that he would not have reached the same verdict." Any subsequent self-serving statements by Juror 9 that his friendship with the victim did not affect his ability to be fair and impartial are, however, "of little consequence" to the issue. Akins, 867 S.W.2d at 356 n.16. Accordingly, the courts should not consider statements about the affect of the bias on the juror's decision making process. Cf. Walsh v. State, 166 S.W.3d 641, 649 (Tenn. 2005) (holding that "Tennessee Rule of Evidence 606(b) permits juror testimony to establish the fact of extraneous information or improper influence on the juror; however, juror testimony concerning the effect of such information or influence on the juror's deliberative processes is inadmissible").

To borrow the words of our supreme court: "His failure under these circumstances to reveal this [friend]ship almost forces the conclusion that he was animated by an ulterior motive in remaining silent, and that this ulterior motive stemmed from a partiality in favor of the prosecution and, by the same token, a bias against [the defendant]." Toombs, 270 S.W.2d at 650. Moreover,

> [t]he integrity of the voir dire process depends upon the venire's free and full response to questions posed by counsel. When jurors fail to disclose relevant, potentially prejudicial information, counsel are hampered in the jury selection process. As a result, the defendant's right to a trial by a fair and impartial jury is significantly impaired.

Akins, 867 S.W.2d at 357.

Based upon the foregoing analysis, this court concludes that the Petitioner has established by clear and convincing evidence that Juror 9 was presumptively biased, which presumption was not overcome by the State, and that the Petitioner was, therefore, denied his constitutional rights to a trial by a fair and impartial jury.

B. Ineffective Assistance of Counsel

Similarly, the Petitioner argues that trial counsel were ineffective by failing to ask prospective jurors during voir dire whether they knew the victim. The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "'so fundamental and essential to a fair trial, and so, to due process of law,

that it is made obligatory upon the States by the Fourteenth Amendment.'" Gideon v. Wainwright, 372 U.S. 335, 340 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465 (1942)). Inherent in the right to counsel is the right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984); see Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). As such, the post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied by a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Id. (citing Tenn. R. App. P. 13(d)). However, a post-conviction court's conclusions of law are reviewed under a purely de novo standard, with no presumption of correctness. Id.

In addressing counsel's performance during voir dire, the post-conviction court recognized, as we have noted above, that no one specifically asked any of the jurors if they knew the victim. The court recounted the extent of the questions otherwise asked to the jurors about their pretrial exposure to publicity and their knowledge of the case. The court acknowledged that several jurors alerted the trial court to their knowledge of the victim and/or his place of business. The post-conviction court concluded, however, after its review of the record as a whole and based upon its findings regarding the claim of Juror 9's bias, that counsel's alleged failure to ask specific questions did not result in a fundamentally unfair

trial in this matter. The court held, therefore, that the Petitioner failed to establish any prejudice related to counsel's voir dire of the prospective jurors.

Our supreme court recently addressed a similar claim of ineffective assistance of counsel in Leonard Edward Smith, 357 S.W.3d at 346, a case we discussed in the previous issue. Smith claimed that his trial attorneys were ineffective by failing to adequately question the prospective jurors about their past experiences either as a victim or with a victim of a crime. Id. One of the jurors who heard the case had a daughter whose boyfriend had been murdered in the year prior to the trial. Id. Neither the trial court nor the attorneys asked the jurors whether they or someone close to them had ever been the victim of a crime. Id. at 347. Our supreme court held,

> "The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial." State v. Hugueley, 185 S.W.3d 356, app. 390 (Tenn. 2006) (citing State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994), and State v. Howell, 868 S.W.2d 238, 247 (Tenn. 1993)). The "proper fields of inquiry include the juror's occupation, habits, acquaintanceships, associations and other factors, including his [or her] experiences, which will indicate his [or her] freedom from bias." State v. Onidas, 635 S.W.2d 516, 517 (Tenn. 1982) (quoting Smith v. State, 205 Tenn. 502, 327 S.W.2d 308, 318 (Tenn. 1959)). While there is no requirement that counsel ask any specific questions of potential jurors during the voir dire process, this Court has previously recognized that potential bias arises if a juror has been involved in a crime or incident similar to the one on trial. See Ricketts v. Carter, 918 S.W.2d 419, 422 (Tenn. 1996); Durham v. State, 182 Tenn. 577, 188 S.W.2d 555, 558 (Tenn. 1945). We believe that questions to cull the jury for persons who might be biased due to their past experiences with the criminal justice system are a critical part of a competent voir dire in criminal cases, and that, absent a showing that counsel had a strategic reason for not asking the question, the failure to ask the prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable. See Hughes v. United States, 258 F.3d 453, 460 (6th Cir. 2001) (stating that "'[a]bsent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel'") (quoting Johnson v. Armontrout, 961 F.2d 748, 755 (8th Cir. 1992)).

Id. The court concluded that Smith established deficient performance on the part of trial counsel, but further concluded that he failed to show any resulting prejudice. The court stated that it has "never presumed bias absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias." Id. at 348. The fact that the jurors in the case were never asked "'a material question reasonably calculated to produce the answer'" weighed heavily upon the court's conclusion: "This case is distinguishable . . . because [the juror in question] was never asked the question and did not willfully conceal his history." Id. (quoting Akins, 867 S.W.2d at 356).

There is nothing in the record before this court demonstrating that trial counsel had any strategic reason why they (or even the trial court for that matter) would not want to know if any of the jurors knew the murder victim in this case. We conclude, therefore, that trial counsel's failure to ask the jurors if they knew the victim, especially after the trial court did not ask the specific question, was objectively unreasonable and resulted in deficient performance under the circumstances. See id. Moreover, because juror bias has already been established, as discussed above, we also conclude that the Petitioner is able to demonstrate the requisite prejudice. This court concludes, therefore, that the Petitioner has established by clear and convincing evidence that he was denied his constitutional right to the effective assistance of counsel during the jury selection process.

## C. Mental Retardation

The Petitioner's remaining issue on appeal concerns the post-conviction court's conclusion that he is not exempted from the death penalty based upon his alleged mental retardation. See Tenn. Code Ann. § 39-13-203. Because, however, the post-conviction court granted the Petitioner a new sentencing hearing, the State correctly argues that this issue is moot on appeal. In Coleman v. State, 341 S.W.3d 221 (Tenn. 2011), our supreme court examined the nature and type of evidence that the trial court shall consider in determining whether a defendant is mentally retarded under Tennessee Code Annotated section 39-13-203. The Petitioner will, therefore, have the opportunity at or before any new sentencing hearing to present evidence concerning his alleged mental retardation and exemption from capital punishment. See Smith, 357 S.W.3d at 355.

## **III. Conclusion**

Based upon our review of the oral arguments, the record, and the parties' briefs, we conclude that the Petitioner was denied his constitutional rights to a fair and impartial jury as well as the right to the effective assistance of counsel during voir dire. The judgment of

the post-conviction court with respect to those two grounds for post-conviction relief is hereby reversed. The Petitioner's convictions are reversed, and the case is remanded to the trial court for a new trial.

_____
NORMA McGEE OGLE, JUDGE