Boyd *v.* The State.

## W. L. Boyd *v.* The State.

1. CRIMINAL LAW. *Order to prosecute. Indictment.* A description of a person slain different in some respects from that contained in an order to the Attorney-General to prosecute *ex officio,* enough appearing to show that the person thus differently described is the same, will not invalidate the indictment.

2. SAME. *Same. Same.* If in the entry of the order to the Attorney-General to prosecute *ex officio,* the clerk enter by oversight a different name, the court, upon affidavit of the clerk and the personal recollection of the judge, may at a subsequent term of the court have a *nunc pro tunc* order entered.

3. SAME. *Same. Presumptions.* Liberal presumptions are made in favor of proceedings of the court in appointment of Attorney-General to *ex officio* prosecute.

4. SAME. *Discharge of jurors.* The discretionary power of the court to discharge jurors for any sufficient cause other than those expressly provided by law, is well settled. The defendant and the State are entitled to the same right, to-wit: a fair trial by unbiased jurors.

5. SAME. *Evidence. Experts.* Experts may testify as to the results of experiments made before and during the trial based upon facts established by the evidence.

6. SAME. *Same.* Upon a trial for murder, there being no direct testimony to show how the killing was done, nor by whom, and the proof not showing clearly that deceased did not commit suicide, it is competent for the defense to show a suicidal tendency in deceased by proof of threats of self-destruction or attempts to commit the act.

FROM DAVIDSON.

Appeal in error from the Criminal Court of Davidson county.    MATT. W. ALLEN, J.

QUARLES, TURLEY & THOMA, E. H. EAST and THOMAS L. DODD for Boyd.

TULLY BROWN and ATTORNEY-GENERAL LEA for State.

DEADERICK, C. J., delivered the opinion of the court.

In September, 1883, plaintiff in error was convicted in the criminal court of Davidson county of murder in the second degree, and sentenced to fifteen years confinement in the penitentiary of the State.    Motions in arrest of judgment and for a new trial having been overruled, he has appealed in error to this court.

Numerous errors in the progress of the trial are assigned, and it is likewise insisted that the evidence does not warrant the verdict.

On July 6, 1883, the following entry appears of record :    *    *    " It appearing to the court that the crime of murder in the first degree had been committed in this county upon the body of one Louisa F., *alias* Birdie McGavock, *alias* Louisa Nicholson, by one Wm. L. Boyd, and that no citizen would allow his name to be entered as prosecutor, it is therefore

ordered by the court that W. H. Washington, attorney-general, prosecute *ex officio*."

Accordingly on the next day the grand jury brought into open court an indictment for murder against W. L. Boyd, which charges him, in appropriate legal terms, with killing, on July 5, 1883, one "Louisa F., *alias* Birdie Patterson, *alias* Louisa Nicholson," signed by W. H. Washington, attorney-general, and endorsed "W. H. Washington, *ex officio*, prosecutor."

It is objected, first, that it does not appear that the court heard any evidence before ordering the prosecution *ex officio*. It is not necessary that it should so appear, as held in the case of *Lawless* v. *The State*, 4 Lea, 175-6. It is next objected that the order directed the prosecution of "Louisa, *alias* Birdie McGavock, *alias* Louisa Nicholson," while the indictment is against "Louisa F., *alias* Birdie Patterson, *alias* Louisa Nicholson."

Even if the judge, at a subsequent term, without any memorandum thereof, made at the term at which the order was made, and without a recommitment of the indictment to the grand jury, had no power to direct that the order should be so amended as to substitute the name "Patterson" for "McGavock," yet we think the order on its face contained a sufficient description or designation of the deceased by her *alias*, other name, of Louisa Nicholson. It is not insisted that she was not well described by this latter name, and the objection only went to the name of McGavock. The evidence showed she was as well known as Mrs. Nicholson as by the name of Patterson. There was no

question as to the identity of the person slain, nor that she was known by the name of Nicholson. It is not the case of naming one person in the order and a different person in the indictment. Both the order and the indictment state the name as Louisa Nicholson, and the proof sustains the averments. It is the designation of one person by two names; if known by either of the two it is sufficient. The object of requiring the name of the deceased to be given when known, is to enable the defendant to know what charge he is called upon to answer. Besides, if the order had wholly omitted the name of the person on whom the offense was committed, this would have constituted no objection to its validity: 7 Baxt., 167.

The object of conferring the power on the court to direct prosecutions *ex officio*, by the 9th sub-section of section 5097 of the Code, was to bring offenders to justice, and the order made in this case was that Boyd should be prosecuted for the murder of a person designated by several different names; and even a description of the person slain, in the indictment, different in some respect from that contained in the order, enough appearing to show that the person thus differently described is the same, would not invalidate the indictment.

As stated, there was no contest over the identity of the person slain, nor that she was not correctly described by one of the two names by which she was designated in the order of the court, and described in the indictment: 2 Swan, 667; 1 Baxt., 180.

And besides, the deputy clerk made an affidavit that he inadvertently and by mistake entered the name "Mc-

Gavock" instead of "Patterson," and the presiding judge at the term at which the erroneous entry was made, as well as at the term at which the order *nunc pro tunc* was made, declared his personal recollection that the order as made was that the name of deceased was "Birdie Patterson," and not Birdie McGavock. In the case of *Shea* v. *Mabry*, 1 Lea, 127, it is held such an entry may be made upon the recollection of the presiding judge.

If the order should fail to state no one would prosecute, this court would presume that the fact so appeared to the court making the order, and indeed, liberal presumptions are made in favor of proceedings under this sub-section in furtherance of the objects for which it was enacted: 4 Lea, 175–6; 7 Baxt., 167, and cases cited.

In making up the jury six jurors had been elected, amongst them one Thomas L. Washington. The attorney-general requested the court to discharge the juror, Washington, because of his relationship to defendant. The juror stated that "John Kirkman married his sister (being his second wife); that Clark Prichitt married John Kirkman's daughter by his first wife; that the father of Clark Prichitt and defendant married sisters"; "and that the grandmother of Mrs. Clark Prichitt and the grand-mother of the wife of the juror were sisters." The juror said he had not thought of his relationship when examined on his *voir dire*.

The juror stated that he should feel embarrassed to sit in the case since the question had been raised.

His Honor discharged the juror, saying that while the relationship did not make the juror incompetent, yet in view of the complicated relationship, the duty would be an embarrassing one, and he ought not to sit on the jury, and in the exercise of the discretion vested in him he would discharge him. To this action of the court defendant excepted. The court allowed defendant two additional challenges on account of the discharged juror, although in strictness, he held he would be entitled to but one, and defendant likewise excepted to this holding, insisting on the right to twenty-four challenges, having challenged already peremptorily fifteen jurors, and being allowed by the court ten, instead of twenty-four challenges, as claimed.

As to the exception to the discharge of the juror: The juror was not incompetent by reason of any express statutory prohibition; technically and legally he was a competent juror. In *Norfleet's* case a juror was selected, but shortly afterwards, and before the jury was made up, the juror stated that he inadvertently stated that he had not made up or expressed an opinion, but he now remembered he had. The court asked the counsel of the prisoner what they proposed to do, they replied "they had nothing to say;" the court then withdrew the juror and discharged him. This court said it was error in the court to discharge the juror without further examination, as his opinion might have been formed from rumor. But under the circumstances, and acquiescence of defendant, they held the prisoner could not avail himself of the error after verdict: 4 Sneed, 342.

In *Lewis'* case, after all the jurors were selected, but before they were sworn, upon motion of the attorney-general, one of them who had been observed by signs to indicate to a brother-in-law of defendant's whom to reject or accept as jurors, was discharged.

This court said there was no error in discharging the juror, saying, "the discretionary power of the court to reject a juror before being sworn, even in a capital case, for sufficient cause, cannot, at this day, be questioned, nor can it be doubted the discretion was properly exercised in this instance": 3 Head, 143.

The discretionary power of the court to discharge jurors for any sufficient cause other than those expressly provided by law, is fully recognized in this case. What is a sufficient cause for the exercise of this discretion is a question to be solved by the circumstances attending each particular case. The trial judge should see, of course, that defendant should have a fair and impartial trial by good and lawful men.

In 2 Gr. & Wat. on New Trials, 192, it is said: "If the court arbitrarily discharge a juror after he has been sworn, without any sufficient reason, it may be ground for new trial," citing *United States* v. *Cornell*, where Judge Story says, "even if a juror was set aside for insufficient cause, I do not know that it is matter of error, if the trial has been by a jury duly sworn and empannelled, and above all exceptions, neither the prisoner nor the government in such a case, have suffered injury," and citing also *Hines* v. *The State*, 8 Hum., 597, affirming the doctrine of the text, that if the court should arbitrarily discharge a juror after

he had been elected, without any sufficient reason, it would be error, but until the jury is sworn, the court may, for any good cause, discharge a juror and select another.

The defendant is entitled to a fair trial by unbiased jurors. The State has the same right, and we cannot say that in this case there was an abuse of the discretion confided to the trial judge—the juror himself admitting he should feel embarrassed to sit as a juror—or that any injury resulted to defendant, nor that he was not tried by a jury free from all exceptions. Although Washington was not incompetent by reason of relationship, yet there was such a family connection between him and the defendant as to furnish a plausible ground of belief in the mind of the court that he would not stand as an impartial juror in the trial of the cause. We cannot say that there was an abuse of the discretion of the judge, or that it was a case of arbitrarily discharging an elected juror without any sufficient cause.

In *Norfleet's* case the court held that it did not sufficiently appear that there was any reason for rejecting the juror, and the error of the court below consisted in its failure to ascertain this fact by further inquiry.

In the *Lewis* case the defendants were given one challenge upon the discharge of the juror. In this case the court gave defendant two, and there was no error in this of which he can complain.

It is also insisted that if this court should hold that the juror was properly discharged, that it was

Boyd v. The State.

error in the court below to refuse to discharge the
other jurors with whom the discharged juror had been
associating for a day and night. But the remaining
jurors were guilty of no fault, and, in such case, it
has been held no presumption of improper communi-
cations will arise, but the burden is upon defendant
to show any impropriety if imputed to them: 11
Lea, 720. In this case it is held that the associa-
tion of selected jurors with one of their number who
had formed and expressed an opinion, and was after
being selected discharged for this cause, did not render
the others incompetent, because, while they remained
with the delinquent jurors they were merely perform-
ing their duty, and were without fault.

The testimony of a number of witnesses who were
experts in the use of pistols, and who had made ex-
periments at different distances with the pistol found
at the side of deceased, was admitted over the objec-
tions of defendant. The witnesses testify that they
have had experience in the use of such arms, and
the results of their experience and experiments were
stated to the jury. One of them stated a man could
not shoot himself in the breast so that the ball would
range down without having his clothes stained with
powder marks, but it might not burn the clothes.
And this result would follow if the muzzle was sev-
enteen inches, or perhaps as far as three feet, from
the person. Other experts testified substantially to
the same effect.

The physician or surgeon who traced the course of
the ball in the body of deceased, testified that the

shot could not have been made with the pistol in the right hand, but it might have been made by holding the pistol in both hands. This evidence was also objected to. We think the evidence of the effects and of the surgeon were properly admitted.

The theory of the defense was that the deceased came to her death by her own hand, and there was evidence *pro* and *con* as to whether there were any powder stains on her clothing. The deceased was shot through the chest, the ball entering under the third rib, on the left side, two and a half inches from the center of the breast bone, coming out at the . eighth rib, and breaking that rib where it joins the back bone.

As stated, the experts derived their knowledge, to some extent, from experiments made shortly before, or, perhaps, in part, during the progress of the trial. A great deal of our knowledge is thus acquired, and it is recognized in every day life as a legitimate source of knowledge. And it is upon this ground of experience or experiment that persons who have devoted their attention to particular branches of science or art may give their opinions, founded upon such experience and observation. So a surgeon was allowed to testify that a pistol must have been fired close to the body of the deceased, because there distinctly appeared marks of powder and burning on the wrist. Whar. on Hom., sec. 677.

But it is insisted that the experiments related by the witnesses ought not to have been admitted. The witnesses were allowed to state with what results they

had fired the pistol at different distances, and from these experiments and other experience to give opinions. The case of *Champ* v. *The State*, 2 Met., (Ky.), 26, is relied upon to show that this evidence was inadmissible. In that case defendant offered to prove by Dr. P., a dentist, that since the occurrences under investigation, the witness had made experiments with chloroform, the result of which was that it could not be given from a vial so as to produce insensibility. The evidence was held to have been properly rejected. The Court of Appeals, by Judge Duvall, who delivered the opinion of the court, said: "Three other dentists had just before stated fully their opinions as to the properties and effects of chloroform—these opinions being founded on experiments—and they concurred in all respects with those offered to be proved by Dr. P. And the attorney-general announced at the close of the testimony of the three dentists, whose opinions, founded on experiments, had been heard, that he did not contend or intend to do so before the jury, that chloroform or any other anæsthetic had been administered, or to offer any evidence contradictory of that already given." "Certainly," said his Honor "under these circumstances it cannot be said the court abused its discretion in stopping the introduction of further evidence on this point." "It may be conceded," said his Honor, that the testimony of this witness was admissible, but it was not important, and its rejection was not, therefore, prejudicial to the appellant."

It is manifest that the evidence was regarded as

admissible and relevant, as three other witnesses had been allowed to testify to the same purport, and that it was held no error to reject it, because the facts were fully proved, and the attorney-general substantially conceded the point, and the introduction of further evidence upon that point was unnecessary. So the case cited sustains the action of the court below in this case. The fact that the witnesses detail the nature of experiments does not diminish the force of the opinions founded upon them. If the experiments are such as to throw light upon the subject of inquiry, testimony as to them is not only admissible, but very material. In most matters the opinion of the witness derives its value from the facts upon which it is founded, whether it be from observation, knowledge or experiment: 3 Head, 480. Obviously the experiments were of the kind to instruct the witnesses as to the results sought to be ascertained—that is, at what distances would the pistol fired into muslin cloth, like that worn by deceased, burn the cloth or stain it with powder marks. Testimony tending to show these facts was pertinent and material in this case. Nor is there any thing in the case cited antagonistic to this view. In another part of the opinion of the learned judge, in 2 Metcalf, it is said that the opinions of experts upon questions of art or science, to be admissible, must always be predicated upon and relate to the facts established by the proofs in the case. Mere professional opinions upon abstract questions of science, having no proper relation to the facts upon which the jury are to pass, should always be

excluded. It was a proper matter for the jury to inquire into and pass upon, whether the pistol was fired near to or against the person of the deceaed, and by her own hand, or whether it was fired by defendant at a greater distance from her than she could hold it from herself; and whether or not her clothes or person were powder burned, or would necessarily be burned at certain distances, might tend to throw light upon this question, but certainly would not necessarily be conclusive, but such opinions do relate to facts shown in the case and not to mere abstract questions having no relation to the facts upon which the jury are to pass.

The case to which this principle was applied in the case cited was as follows: A physician was asked if, in his opinion, diseases and deranged action of the womb do not cause delusions of the mind. The court held the exclusion of this evidence was proper, because there was no evidence that Mrs. Champ, the witness, was laboring under any disease or deranged action of the womb, but facts proved excluded any such conclusion. An opinion, therefore, upon such a question would be a mere abstraction, having no relation to the facts upon which the jury are to pass, and might lead their minds from the real points of inquiry.

In Wharton on Homicide, section 679, it is said: "Whether a particular wound could have been produced by a particular instrument, is a question as to which the opinion of experts can be asked." And in a case cited in note 5, from 1 Brewster, 566, it

appeared defendant was indicted for killing Mrs. Hill by breaking her skull with a poker, which had been exhibited in court. The court referred to the case in 2d Metcalf approvingly, and held that defendant might show that the poker offered in evidence by the commonwealth could not inflict the wounds on Mrs. Hill's skull. But the experiments of the witness on another skull with another poker, should be excluded. The exclusion was based upon the admission that the arm, weapon and skull were different from those established by the facts in the case, and the evidence was held inadmissible, as being an opinion upon an abstract question. But where the defense of suicide is raised it is important to inquire whether the wound is in a place which could not have been reached by deceased. This may often be ascertained by placing the weapon in the hand of the corpse and observing whether its direction corresponds with that of the wound: Whar. Crim. Ev., 776. And we see no objection to similar experiments being made by a living person upon his own body.

During the progress of the trial defendant offered in evidence the depositions of Wm. M. Bray, Dr. Keery, Marietta Bostick and J. C. Nicholson. The attorney-general objected to the admissibility of said depositions so far as the testimony related to the previous actions, habits and character of the deceased. The depositions were handed to the court and he ruled the entire depositions inadmissible, and defendant excepted.

Bray and Dr. Keery depose to the general bad character of deceased, and state that she was a common

prostitute, and give some particulars, as indicating her lewd habits.

Marietta Bostick and Nicholson, in addition to testifying to her bad and lewd character, state that she drank liquor and used morphine, and that she frequently threatened to commit suicide when in a melancholy state of mind, and she had upon one occasion, which is mentioned, attempted to carry out her threats, but was unsuccessful in the attempt.

The depositions of Bray and Keery, we think, were properly rejected. They contain no evidence of threats or attempts, or other relevant evidence to any legitimate issue in the cause. The other two depositions do contain evidence that deceased threatened to commit suicide, and that she once attempted it.

It is argued that there is no direct testimony to show how the killing was done, nor by whom, and where the proof does not clearly show that deceased did not commit suicide, that it is competent for the defense to show a suicidal tendency in deceased, by proof of threats of self-destruction, or attempts to commit the act. The general rule of law is that the bad character of decedents cannot be proved in a prosecution for murder: Whar. on Hom., sec. 605.

But an exception to this rule is 'made where the defendant sets up self-defense, and presents a case of apparent danger honestly believed to exist. Then evidence of the brutality, ferocity, strength and vindictiveness of deceased to show the reasons for defendant's apprehension of danger of death or great bodily harm, is admissible: *Ibid*, sec. 606. This doc-

trine is held in many cases in our own State. In 23 Ohio, 146, there was evidence on the trial tending to prove that the death of deceased was occasioned by suicide, and also tending to show that the prisoner had administered the poison which caused the death. The prisoner offered to prove by a witness called for that purpose, with whom deceased had lived six years prior to her death, that deceased while living with the witness, was of a melancholy disposition, and had threatened to commit suicide.

The evidence was rejected upon the trial, and upon appeal the Supreme Court of Ohio said the testimony had been rejected upon the ground of remoteness, referring, as it did, to a period six years prior to the death of deceased. The court adds: "It seems to us that this lapse of time should go merely to the weight and not to the competency of the testimony, and we are inclined to think the exception to the ruling of the inferior court well taken. And the judgment of the court below was reversed, although it was said the testimony was apparently of but small importance.

We have been referred to note 1 to section 780 of Whar. Crim. Ev., in which Dr. Carper enumerates conditions as throwing light upon the question of suicide: First, The condition in life and personal surroundings of deceased, so far as they are likely to impel to suicide. Second, Threats or intimations on the part of deceased that he harbored such an intention, he being found in a room made fast from within, etc. Third, Of far more importance, however, is an examination of the body, its clothing, position, etc.

It will be observed that in the case cited there was evidence tending to show suicide, and the court held that the evidence of melancholy, predisposition and threats to commit suicide, were admissible, although of small importance, and in the note of Dr. Carper he enumerates as legitimate subjects of inquiry: First, The condition in life and personal surroundings of deceased so far as they may be likely to impel to suicide. This does not mean that the general character and habits of the past life may be inquired into, but that the condition and surroundings at the time of the death may be looked into if of a character likely to impel to suicide. Second, Threats or intimations of such a purpose by deceased, he being found in a room fastened within.

The evidence of threats and attempt to commit suicide in the Ohio case cited, seems not to have been objected to as irrelevant, but as too remote in point of time. When the threats or attempt offered to be proved in this case occurred, the record does not disclose. But as there is no direct testimony as to the fact of the homicide, the testimony of suicidal tendency, in the opinion of a majority of the court, was relevant, and ought to have been admitted—limited to the inquiry as to melancholy or despondent disposition of deceased, and to threats to commit suicide, and attempts at self-destruction.

And, for the error of the court below in the rejection of evidence of this character offered by defendant on his trial, the judgment below will be reversed and a new trial awarded.