**TENNESSEE FARMERS MUTUAL INSURANCE COMPANY and South Carolina Insurance Company, Plaintiffs, Counter-Defendants, Appellants,**

v.

**C.D. GREER and wife, Anna Lee Greer, and Jackson Production Credit Association, Defendants, Counter-Plaintiffs, Appellees.**

Court of Appeals of Tennessee, Western Section, at Jackson.

June 11, 1984.

Rehearing Denied July 11, 1984.

Permission to Appeal Denied by Supreme Court Sept. 24, 1984.

Thomas H. Rainey, Menzies, Rainey, Kizer & Alderson, Jackson, for plaintiffs, counter-defendants, appellants.

Robert V. Redding, Reynolds, Deusner & Redding, Selmer, for defendants, counter-plaintiffs, appellees.

MATHERNE, Special Judge:

The plaintiff insurance companies seek a declaratory judgment on whether they are liable to the defendants for the loss of about 40,000 hens. The defendants filed a

counter claim, suing under the policies issued them by the plaintiffs. The jury held for the defendants, and judgment for damages plus prejudgment interest in the amount of $120,418.15 was entered in favor of the defendants and against the plaintiffs. The plaintiffs appeal under ten issues for review. We will consider only two of those issues, namely, (1) whether the juror Mrs. Helen Nichols was guilty of such misconduct as to require a new trial, and (2) whether the chancellor erred in overruling the plaintiff's motion for a directed verdict.

### I. *The Motion for a Directed Verdict*

On or about May 24, 1980, electric power was lost to approximately 32 of 36 fans in laying house No. 4 on the defendant's poultry farm. About 40,000 hens in laying house No. 4 died as a result of the fans being inoperative.

The policies insured, as to scheduled payment [which included the chickens] as follows:

### Perils Insured Against

This policy under this form insures against direct loss to the property covered by the following perils, subject to the conditions herein and of the policy of which this form is made a part.
*Fire or Lightning,* excluding any loss resulting from any electrical injury or disturbance to electrical appliances, devices, fixtures or wiring caused by electrical current artificially generated, unless fire ensues and then only for the loss caused by such ensuing fire.

The plaintiffs argue that under the above coverage any loss resulting from any electrical injury or disturbance by lightning would not be covered unless fire ensued and then only to the extent of loss caused by the ensuing fire.

The plaintiffs further claim that the loss was excluded from coverage under the following policy provision:

This policy under this form does not insure against loss: ... (4) caused by or resulting from power, heating or cooling failure.

The defendants claim that lightning struck the electrical supply to building No. 4, as a result of which a fire ensued causing the loss of electrical power through the operating of a circuit breaker, which interrupted the power supply to the fans.

On the night of May 24, 1980, a severe electrical storm swept through the area of the defendant's poultry farm. The death of the chickens was not discovered until the following morning when an employee observed the situation and called Don Greer, son of the defendants. When Greer arrived at the building he discovered that a 400 ampere breaker had tripped, cutting off the power supply to the 32 fans. He testified that the fans did not serve to cool the building, but to remove noxious gases generated from the manure droppings. Greer observed that a 30 ampere breaker, located on the top right of two columns of such breakers was burned away. Greer also observed smoke and charred marks on the main breaker, and smoke on the panel box in an area directly below the 400 ampere breaker and behind the damaged 30 ampere breaker.

The damage to the electrical system was examined by one expert, Delmon Ashcraft, for the defendants, and three experts, Russell Jackson, Malcolm Martin and Joseph Googe, for the plaintiffs. Ashcraft felt that there was evidence of a fire because of smoke damage and molten aluminum and copper droplets in the panel. His opinion was that lightning damaged the 30 ampere breaker and caused it to build up a temperature high enough to trip the 400 ampere breaker or caused arcing which tripped the 400 ampere breaker magnetically.

Russell Jackson's opinion was that the ventilation fans went off because of a poor connection and corrosive elements which were present in the panel, namely, ammonia, dirt and chicken feathers.

Malcolm Martin's opinion was that the 30 ampere breaker failed because of a high resistence contact caused by corrosion from the atmosphere. He was of the opinion that lightning did not cause the damage.

Joseph Googe's opinion was that the damage to the 30 ampere breaker was caused by heat damage due to arcing between missing connectors on the breakers. The arcing produced high temperatures, and the bakelite on the breaker decomposed and fell away. He was of the opinion that lightning did not cause the damage.

■ When ruling on a defendant's motion for directed verdict the court must take the strongest legitimate view of the evidence of the plaintiff, allow all reasonable inferences in his favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence or any dispute as to any material determinative evidence. *Holmes v. Wilson* (Tenn.1977) 551 S.W.2d 682.

■ We, therefore, affirm the chancellor's overruling the plaintiff's (counter-defendant) motion for a directed verdict. We also affirm the granting of that motion insofar as disallowing the defendant's (counter-claimant) claim for the statutory bad faith penalty.

## II. *Juror's Misconduct*

We hold that the juror, Mrs. Helen Nichols, was guilty of such misconduct as to require a new trial of this lawsuit.

On voir dire the plaintiff's attorney asked the jurors the following:

Q. Do any of you know—I'm going to name some witnesses in this case and ask you whether you—possible witnesses, and ask you whether you know or are acquainted with them or whether *any member of your family* might know them or be related to them. (Emphasis added.)

Counsel then named five potential witnesses and ended the list with the following or sixth witness so named:

Q. Mr. Delmon Ashcraft, engineer, in Corinth, Mississippi.

No potential juror, including Mrs. Helen Nichols, gave an audible answer to the question as it related to each witness named, including Delmon Ashcraft.

At other points in the voir dire the plaintiff's attorney emphasized the fact that the proof would include the testimony of expert witnesses and that Mr. Ashcraft would appear as an expert witness on behalf of the Greers and stressed the importance of there being no connection between a juror and Mr. Ashcraft which might in any manner influence a juror.

After the jurors were selected, the chancellor instructed them on certain rules which they must follow, the first of these rules given was:

Number one, to not mingle with or talk to the lawyers, the witnesses, the parties or any other person who might be connected with or interested in this case, except for casual greetings.

The trial began with the testimony of Don Greer, the son of the defendants. The next witness was Mr. Ashcraft, who had completed his testimony on first direct examination and was apparently still on the witness stand, when the following occurred:

*The Court:* Nine o'clock. We'll recess— it's five-thirty right on the nose. And we'll just resume this at nine o'clock in the morning.

No, I can't let you ask the witness anything.

*Mrs. Nichols:* It's not about this. I want to ask him about my son. *They work together.* (Emphasis added.)

*Mr. Ashcraft:* Ask me tomorrow. (Whereupon, the jury was dismissed, and the Court adjourned at approximately 5:30 P.M. on March 28, 1984....)

No objection or motion was made at that time as a result of the action and statements of Mrs. Nichols. The insurer's attorney made the action and statements of Mrs. Nichols Ground # 5 of his motion for a new trial which was overruled by the chancellor.

■ There are two broad classes of causes for challenge of a juror: (1) propter defectum (on account of some defect) from personal objections as alienage, infancy, lack of statutory requirements, etc., and (2) propter affectum (on account of partiality)

from some bias or partiality either actually shown to exist or presumed to exist from circumstances. *Durham v. State* (1945) 182 Tenn. 577, 188 S.W.2d 555.

■ Generally, objections to a juror based upon causes propter defectum cannot be made after verdict. *Monday v. State* (1930) 160 Tenn. 258, 23 S.W.2d 656; *Nashville C. & St.L. Ry. v. Williams* (1932) 164 Tenn. 144, 46 S.W.2d 815. The reason for the rule is that a mere technical defect, or the failure of a juror to meet certain required qualifications, does not raise the presumption of bias on his part. Unless prejudice be actually shown it cannot be presumed that the technically incompetent juror was not impartial and fair in his deliberations.

■ However, objections to a juror based upon causes propter affectum may be made after verdict. *Durham v. State, supra.* The ground for challenge in the instant case is the deliberate withholding of information asked for on voir dire. This amounts to false swearing and does raise the presumption of bias and partiality. Mrs. Nichols cannot be said to have entered the jury box with an indifferent mind toward the parties. From this false swearing it must be presumed that Mrs. Nichols was deprived of the ability or capacity to act impartially and disinterestedly. The challenge in this lawsuit is of the propter affectum class.

■ According to the record, only Mrs. Nichols, Delmon Ashcraft and the chancellor had any knowledge of Mrs. Nichols admitted misconduct on voir dire, and the chancellor gained the knowledge after the trial was in progress. The insureds argue that objection by counsel for the insurer should have been made, and if that counsel did not know of the admitted misconduct, he should have by due diligence known of it. We hold this argument to be unfounded. The only reason any motion or challenge is made is to inform the trial court of facts which require action on the part of the court. Here, the chancellor had the facts, there was no need to inform him. We hold that the chancellor committed reversible error when he failed to inform counsel of the event which happened before him and take such action as necessary to insure a fair and impartial jury. We also note that two alternate jurors had been qualified and were available for service as regular jurors.

### III. *Conclusion*

The judgment of the chancellor overruling the plaintiffs' motion for a directed verdict except insofar as it dismissed the defendant's claim for the statutory bad faith penalty is affirmed. The chancellor's failure to grant the plaintiffs' motion for a new trial because of juror misconduct is reversed. This cause is remanded to the trial court for a new trial. The accumulated cost to date in the trial court and in this court is adjudged one-half against each party. The cost of the new trial will be there adjudged.

TOMLIN and CRAWFORD, JJ., concur.