# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### August 6, 2013 Session

## STATE OF TENNESSEE  v. DANNY HOWARD

**Appeal from the Criminal Court for Shelby County**
No. 10-06809     W. Otis Higgs, Jr., Judge

---

**No. W2012-02109-CCA-R3-CD  - Filed December 2, 2013**

---

The Defendant-Appellant, Danny Howard, appeals his conviction for aggravated robbery. On appeal, Howard argues that the trial court abused its discretion (1) by permitting a juror to remain on the jury after learning that the juror worked with one of the State's witnesses, and (2) by denying Howard's motion for a mistrial based on an alleged <u>Jencks</u> violation. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, and JOHN EVERETT WILLIAMS, JJ., joined.

Neil Umstead, for the Defendant-Appellant, Danny Howard.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Katherine B. Ratton and David M. Zak, Jr., Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

### FACTS

On October 10, 2009, Brenda Hall, the victim in this case, was robbed after she left a local store in Bartlett, Tennessee. The perpetrators put a gun to the victim's rib cage and demanded her purse. The victim complied and later called the police. After some investigation, Howard was developed as a suspect and charged with the instant offense. The following proof was adduced at trial.

Matthew McArthur, an officer with the Bartlett Police Department, testified that at approximately 7:45 p.m. on October 10, 2009, he responded to a call regarding the robbery of an individual at the Dollar General store in Bartlett. Upon arriving at the scene, the victim of the robbery, Brenda Hall, gave him a description of her two assailants and showed him the direction they ran following the robbery. She stated that one of her assailants, who she later identified as Howard, was a young African-American man with a light complexion and braided hair, who was approximately six feet tall and was wearing a white hooded sweatshirt with a design on the front. She stated that Howard robbed her at gunpoint while the other assailant stood several feet away. She stated that the other assailant was an African-American man wearing darker clothing. Officer McArthur said he was able to view the surveillance footage from inside the store prior to Detective Jones's arrival. He stated that the store clerks informed him that the two men responsible for robbing the victim had been inside the store at the same time as the victim. Officer McArthur watched the surveillance videotape again once Detective Jones arrived at the scene. He remembered watching this videotape with the store clerks but could not remember whether the victim also viewed the surveillance footage that night.

Latoya McLaurin, the Dollar General store's manager, testified that she arrived at work around 8:30 p.m. on October 10, 2009, and reviewed the store's video surveillance footage with Officer McArthur, Detective Jones, and one of the store's employees. She did not remember seeing the victim with the police when she arrived at work. She said that the victim and the victim's neighbor returned to the store the next day and viewed the surveillance footage. The surveillance videotape was played for the jury at trial, and McLaurin identified a man in a white hooded sweatshirt and another man in a dark hooded sweatshirt walking out the store's door.

David Jones, a Detective with the Bartlett Police Department, testified that when he arrived at the scene, he talked to Officer McArthur and the victim about what happened and learned that there was surveillance footage of possible suspects leaving the Dollar General store. He watched the surveillance footage that night. The victim informed Detective Jones that she believed her assailant probably lived in the area. Detective Jones later developed Howard as a suspect after the victim informed him that she had spoken to her neighbor, Tony Moton, who identified Howard from the surveillance footage.

Detective Jones said he created a photographic lineup consisting of six individuals, and the victim identified Howard's photograph, photograph number four, as the assailant that approached her in the parking lot. He later presented this photographic lineup to Moton, who identified Howard as one of the men in the store's surveillance footage. Before presenting the photographic lineup, Detective Jones informed the victim and Moton that the assailant might or might not be in the photographic lineup and that the photographs in the lineup might

be old or new pictures. He noted on the photographic lineup that Moton, who had coached Howard in football, stated that he was "one hundred percent sure" of his identification of Howard from the photographic lineup. Detective Jones stated that Howard, at the time of his arrest, was wearing the same white hooded sweatshirt and hairstyle that was depicted in the Dollar General store's surveillance videotape.

On cross-examination, Detective Jones stated that he arrived at the scene at 10:00 p.m. and watched the surveillance videotape with the victim. After refreshing his memory with his arrest report, Detective Jones stated that the surveillance video showed the victim and her assailants inside the store at the same time prior to the robbery. He acknowledged that he took no photographs to show the lighting conditions in the parking lot at the time of the robbery. Detective Jones stated that he created a supplement, called an investigative narrative, that was different from the narrative that defense counsel had just given to him.

Detective Jones admitted that the victim was "physically distraught" at the time that he interviewed her. When he presented the photographic lineup, Detective Jones informed the victim and later Moton that the perpetrator might or might not be in the group and that the lineup might contain old or new pictures. He stated that the victim identified Howard as her assailant in a "[m]atter of seconds." He wrote on the photographic lineup that the victim stated, "I'm one hundred percent sure it's number four that pulled a gun on me and took my purse in front of Dollar General store." He acknowledged that the date of October 13, 2009, on the photographic lineup was wrong because the victim and Moton viewed the photographic lineup on October 20, 2009. Detective Jones stated that he created the photographic lineup after the victim talked to Moton and then called him with Howard's name. He stated that the victim's property taken in the robbery was never recovered.

During Detective Jones's cross-examination, defense counsel discovered that Jones was referring to a second report he had written that he described as an "investigative narrative." Defense counsel asked Detective Jones if he had provided a copy of this second report to the district attorney's office, and he stated, "They normally get copies of everything."

When cross-examination continued, defense counsel asked Detective Jones if there were any other documents that he had not provided to the district attorney's office, and Detective Jones stated that he had provided this second report to the district attorney's office. He acknowledged that he never sought a search warrant for Howard's home, despite the fact that he had not found any of the proceeds from the robbery or the weapon used during the offense. He stated that Howard refused to disclose the name of the other assailant.

On redirect examination, Detective Jones explained that he did not get a search warrant in this case because he did not have probable cause to obtain a warrant, given that Howard lived with his mother and that there was another unidentified assailant involved in the robbery. He said he used six photo cards rather than a printed page containing six photographs because it was more difficult to get photographs of juveniles. Detective Jones stated that he had been involved in other cases where witnesses were unsure about their identification and that he always noted this fact on the identification form. He said he was sure that he showed the photographic lineup to the victim and Moton on the same day because he noted it in his narrative.

Brenda Hall, the victim, testified that she had bought some spray paint for her daughter for a church project at the Dollar General store around 7:30 p.m. on October 10, 2009. As she exited the store, she noticed two young men in the parking lot. As she got into her car, she "felt a tug and somebody had–was grabbing my purse and spun me back around." When she refused to let go of her purse, she felt something stick in her ribs and heard Howard say, "Lady if you don't let go I will shoot you." When she saw the barrel of Howard's gun and observed the second assailant, she released her purse. She stated that all of her credit cards and cash were stolen in the robbery.

The victim stated that Howard was a young African-American man with a light complexion, who was skinny and tall, approximately six feet or more, and who was wearing a white zippered sweatshirt with a design on the front. She stated that her other assailant was shorter, had a dark complexion, and was wearing a dark hooded sweatshirt. She stated that she got a "[v]ery good look" at Howard during the robbery. She recalled viewing the store's surveillance footage the same night as the offense. She identified Howard on the surveillance footage for the jury.

After the robbery, the victim spoke to her neighbor, Tony Moton, because she thought he might be able to identify the name of her assailant because Moton's son was close to the same age as her assailant and knew many of the teenagers in the area. The day after the robbery, Moton went with her to view the surveillance footage at the store and identified Howard, and the victim gave Howard's name to the police. The victim said she identified Howard from a photographic lineup approximately one week after the robbery. She also identified Howard at trial. The victim stated that it took her approximately thirty seconds to identify Howard as her assailant in the photographic lineup and that she was "a hundred percent sure" of her identification.

On cross-examination, the victim said that as she was leaving the store, she became concerned when she saw the two young men in the parking lot. However, she convinced herself that they were just kids hanging out on a Saturday night. As she opened her door to

get inside her vehicle, she felt a tug on her purse, which caused her to spin around. Although Howard was wearing a white hooded sweatshirt at the time, he did not have the hood pulled up, so she was able to clearly view his face and braided hair. After the robbery, she went inside the store and described Howard to the clerks, who informed her that Howard and the other assailant had been inside the store earlier that night. The clerks told her that they were afraid that the two men who robbed her were going to rob the store. She did not remember the clerks telling her that she had been inside the store at the same time that the men were in the store.

The victim did not recall stating at a prior hearing that she looked at seven photographs, rather than six, in the lineup. She stated that when she first looked at the lineup, she narrowed the photographs down to two before choosing Howard as the man who robbed her at gunpoint. She remembered Detective Jones writing something on the photographic lineup form before she signed it. She stated that although she did not include the fact that one of her assailants had light skin in the first report, she told Officer McArthur that fact when he arrived at the scene, and this fact was included in a later police report.

On redirect examination, the victim stated that she first gave a brief description of her assailants to Officer McArthur because the police were hopeful that they could locate the two men who robbed her. Later, when Detective Jones arrived, she gave a more detailed description of her assailants. The victim said she was able to get a good look at Howard because the interior lights on her car, the lights on the sidewalk, and the lights in the parking lot shone on Howard's face during the robbery. She remembered giving Howard's name to Detective Jones on either October 12, 2009, or October 13, 2009.

Constantine Moton testified that he commonly went by the nickname of Tony and that he was the victim's neighbor at the time of the robbery. He stated that the victim came over to his house on October 11, 2009, the day after the robbery, and asked him to look at the store's surveillance video with her in the hope that he might be able to identify her assailants. The trial court then excused the witness and the jury after being notified by the bailiff that one of the jurors worked with Moton.

When the direct examination continued in the presence of the jury, Moton stated that he went with the victim to the Dollar General store on October 11, 2009, viewed the surveillance videotape, and identified Howard as the individual in the videotape. Moton stated that he was able to identify Howard because he had known Howard since Howard was five years old, because Howard and his son had gone to school together, and because he had coached Howard on a football team. He identified Howard on the surveillance video that was played for the jury and stated that he was "one hundred percent sure" that the individual in the videotape was Howard. He stated that he did not know the person with Howard.

-5-

Approximately one week after viewing the videotape, Moton identified Howard in a photographic lineup. Moton told Detective Jones that he was "one hundred percent certain" that Howard was the person from the store's surveillance videotape because Howard was friends with his son and because he had coached Howard in football.

On cross-examination, Moton acknowledged that his only involvement in the case was to identify the individual in the videotape and that he had no information regarding the actual robbery. He also acknowledged that in his statement to police, he erroneously stated that he viewed the store's surveillance videotape with the victim on October 18, 2009, even though he actually viewed it on October 11, 2009. He stated that he probably made this error because the police were interviewing him at work, and he was "rushed."

The jury convicted Howard as charged in the indictment, and this timely appeal followed.

## ANALYSIS

**I. Juror Disqualification.** Howard argues that trial court abused its discretion in denying his request to replace juror Robert Anderson with an alternate juror after Anderson informed the court that he and Moton, a witness for the State, worked at the same company. Howard asserts that the trial court's error in not replacing Anderson with an alternate juror was a structural error requiring reversal because it violated his right to a trial by jury and his right to use peremptory challenges. Alternatively, Howard contends that even if this error was not a structural error, Anderson's "failure to disclose his relationship with Mr. Moton in the face of specific inquiry is tantamount to active concealment, which raises a presumption of bias." The State responds that Howard is not entitled to relief because the trial court accredited Anderson's testimony that he and Moton were not friends and that he could remain impartial.

The record shows that on Monday, June 25, 2012, Anderson did not respond during voir dire when the State asked the prospective jurors if anyone knew any of the witnesses in this case. The State said, "Constantine Moton, he also goes by Tony. Any of those names ring a bell?" Following voir dire, Anderson was sworn in as a juror. However, on Tuesday, June 26, 2012, when Constantine "Tony" Moton began testifying for the State, Anderson almost immediately notified the trial court that he knew Moton. After the State asked seven questions of Moton, the trial court excused Moton and the jury and stated the following:

> One of the Jurors signaled . . . the [d]eputy . . . over and said he works
> with the witness. I don't put that man–you've voir dired the jury on the

-6-

witnesses that you were going to call, and obviously he didn't recognize the name, but he says he works with this gentleman.

It happens sometimes that a juror will recognize a witness, it doesn't do anything, I mean, if you like we can call the juror out and given him some statements governing his conduct relative to this person. But I'll hear from you. He says he works with [Constantine Moton], I don't know where this man works it hadn't [sic] been developed yet, but do you have some suggestions on how we ought to handle that?

At that point, defense counsel argued that the fact that Anderson worked with one of the State's witnesses would be grounds to excuse him and replace him with one of the alternates. The State asked the court to allow the parties to question Anderson to determine the extent of his association with Moton.

In response to questioning by the trial court, Anderson stated that he knew Moton because he and Moton worked at McKesson Pharmaceuticals. He said they only talked about work-related topics and were not friends. When the court asked if he could set aside what he knew about Moton and be a fair and impartial juror, Anderson stated, "Yes, I can. That's why I notified the Bailiff that, you know, that he worked with me because I didn't want no conflict if something ever comes up." Anderson stated that he could listen to Moton's testimony, give it whatever weight he thought it was entitled, and be fair. Defense counsel briefly questioned Anderson, and Anderson stated that he saw Moton at work on Tuesday, Wednesday, and Thursday nights. When asked by defense counsel if he regularly spoke to Moton at work, Anderson replied:

Yes, when he comes in I speak to him or if he needs a fork lift to grab something out of the vial box, he will ask me if anybody is driving the lifts; I say yes or he can get it, you know. Or, if I said well, we are going to need such and such routes for him to ice up and he would bring it out.

Anderson stated that he and Moton were not in a supervisory relationship and worked in different departments at the company.

The State asserted that there was no reason to remove Anderson because Anderson and Moton merely worked at the same company and their only conversations were work-related. Defense counsel stated that he was not comfortable with Anderson remaining on the jury because Anderson saw Moton on a regular basis and although he did not fault anyone for not knowing about Anderson's association with Moton, he asserted that Anderson most likely would not have been on the jury if the defense had known about this association during

voir dire. He asked the trial court to remove Anderson and replace him with an alternate juror. Noting Anderson's ability to be fair, the trial court denied defense counsel's request. Defense counsel also raised this issue in his motion for new trial, which the trial court denied reasoning the same.

A defendant's right to trial by an impartial jury is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article I, section 9 of the Tennessee Constitution. "Both the defendant and the State are entitled to a fair trial by unbiased jurors and it is the duty of the Trial Judge to discharge any juror who for any reason cannot or will not do his duty in this regard." Walden v. State, 542 S.W.2d 635, 637 (Tenn. Crim. App. 1976) (citing Boyd v. State, 82 Tenn. 161 (1884)). Moreover, this court has held that every defendant is assured "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" State v. Akins, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1995) (quoting Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954)).

Tennessee law allows for alternate jurors to "replace jurors who become unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict." Tenn. R. Crim. P. 24(f)(2)(B); see State v. Goltz, 111 S.W.3d 1, 4-5 (Tenn. Crim. App. 2003). "The determination of whether a juror is unable or disqualified to perform his duties lies within the sound discretion of the trial court." Goltz, 111 S.W.3d at 5 (citing State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995)). A trial court's decision about juror disqualification will not be overturned absent a showing of an abuse of discretion. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989) (citing Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979)). The primary reason a trial court is granted broad discretion in determining a juror's disqualification is because the court is able to "observe the demeanor and credibility of the juror." Forbes, 918 S.W.2d at 451; see State v. Smith, 993 S.W.2d 6, 29 (Tenn. 1999); State v. Harris, 839 S.W.2d 54, 64 (Tenn. 1992).

First, Howard claims that the trial court's error in failing to replace Anderson with an alternate juror requires reversal because it constitutes a structural error that affected his right to a trial by jury and his right to use peremptory challenges. The State asserts that Howard's issues regarding structural error are waived because he never raised these specific issues in his written motion for new trial or at the hearing on this motion, instead only asserting a general claim that the trial court erred by not replacing Anderson with an alternate juror, and because he never asserted plain error on appeal. Initially, we note that this court should "view the motion [for new trial] in the light most favorable to the appellant, and it should resolve any doubt as to whether the issue and its grounds were specifically stated in favor of preserving the issue." Fahey v. Eldridge, 46 SW.3d 138, 143 (Tenn. 2001); State v. Marvin Wendell Kelley, No. M2011-02260-CCA-R3-CD, 2013 WL 5827646, at *11 (Tenn. Crim.

App. Oct. 29, 2013). After reviewing Howard's motion for new trial, we conclude that he properly preserved these issues for review.

"Structural constitutional errors are errors that compromise the integrity of the judicial process itself." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (citing State v. Garrison, 40 S.W.3d 426, 433 n.9 (Tenn. 2000)). Structural errors cause a criminal trial to be "'fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" State v. Bowman, 327 S.W.3d 69, 91 (Tenn. Crim. App. 2009) (quoting Neder v. United States, 527 U.S. 1, 9 (1999). Consequently, "[s]tructural constitutional errors are not amenable to harmless error review, and therefore, they require automatic reversal when they occur." Rodriguez, 254 S.W.3d at 371.

Howard, citing State v. Bobo, 814 S.W.2d 353 (Tenn. 1991), argues that the trial court's denial of his request to replace Anderson with an alternate juror violated his right to a trial by jury. In Bobo, the trial court discharged the alternate jurors after the close of all the proof. Id. at 354. Approximately an hour after the jury began to deliberate, the trial court discovered that one of the jurors, Selena Coleman, had told the other empaneled jurors that she believed that Johnson, a co-defendant who was being jointly tried with Bobo, had killed her twelve-year-old cousin ten years before. Id. When the remaining jurors were individually questioned about Coleman's statement, they all stated that they could remain impartial and would not consider Coleman's statement during their deliberations. Id. at 355. At that point, Johnson's attorney moved for a mistrial, and the trial court overruled the motion, excused Coleman, and replaced her with one of the two alternates, who had been discharged for approximately an hour and a half and who had already returned to work. Id. After determining that the alternate juror had not been prejudiced by anything occurring after her discharge, the court reminded her of her oath and reseated her on the jury, and the jury continued its deliberations. Id. Prior to reseating the alternate juror, the trial court did not recharge the jury and did not instruct the jury to begin their deliberations from the beginning. After one hour and twenty minutes, the jury returned its verdict finding both Johnson and Bobo guilty of second degree murder. Id.

In Bobo, the Tennessee Supreme Court expressed concern because thirteen jurors had participated in the deliberation process but only twelve jurors had decided the guilt or innocence of the defendants. Id. at 356. The court was also concerned that it had no assurances that the alternate juror, who had been reseated after deliberations had begun, had actively participated in all of the deliberations. Id. Accordingly, the court held that "the substitution of jurors after final submission of the case, coupled with the trial court's failure to instruct the jury to begin deliberations anew, violated [the] defendant's right to a trial by jury under Article I, § 6 of the Tennessee Constitution." Id. It then held that reversal was required in this case:

We believe that any errors affecting the constitutional right to trial by jury will result in such prejudice to the judicial process that automatic reversal is required. Tenn. R. App. P. 36(b). See State v. Perry, 740 S.W.2d 723 (Tenn. 1987); State v. Onidas, 635 S.W.2d 516 (Tenn.1982). Such violations are defects in the structure of the trial mechanism and thus defy analysis by harmless error standards. Arizona v. Fulminante, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991).

Id. at 358.

We conclude that Bobo, where a juror was replaced after deliberations had begun, is inapplicable to this case. Here, Howard challenged Anderson for cause well before jury deliberations. The same twelve jurors that heard the proof and arguments at trial participated in the deliberation process and determined Howard's guilt or innocence. See State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997) (citing Bobo, 814 S.W.2d at 356). Moreover, as we will more fully explain below, Howard failed to present any evidence that the jury in his case was not fair and impartial. See Howell, 868 S.W.2d at 248; State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989). Although Howard's for cause challenge to Anderson was unsuccessful, he was not denied the constitutional right to a trial by a jury, and no structural error exists requiring a reversal.

In addition, citing State v. Spratt, 31 S.W.3d 587 (Tenn. Crim. App. 2000), Howard argues that Anderson's "active concealment" of his association with Moton during voir dire requires reversal because it deprived him of his right to peremptorily challenge Anderson during voir dire. In Spratt, this court held that the defendant was entitled to a new trial when he was prevented from using peremptory challenges against two jurors because the trial court erroneously applied the Batson test:

When a defendant is wrongly deprived of peremptory challenges because of a trial court's erroneous application of the Batson test, the remedy is a reversal of the conviction and a remand for a new trial. McFerron, 163 F.3d at 955-56. Therefore, we reverse Defendant's conviction[,] and we remand this matter for a new trial. Reversal and remand are required pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure in order to prevent prejudice to the judicial process. This result is necessary even though Defendant is not entitled to relief on the other issues, including the legal sufficiency of the evidence.

Id. at 598. Howard claims that he is entitled to a new trial based on the reasoning in Spratt. He asserts that if Anderson had revealed his association with Moton during voir dire, Anderson would have been removed from the jury for cause or with a peremptory challenge.

-10-

We also conclude that Spratt does not apply to this case. Significantly, the holding in Spratt regarding peremptory challenges has been limited to cases involving Batson error. See, e.g., State v. Eric Cathey, No. W2008-01446-CCA-R3-CD, 2010 WL 2836632, at *9-13 (Tenn. Crim. App. July 20, 2010); State v. Torrez Talley, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *6-9 (Tenn. Crim. App. Oct. 16, 2006); State v. Chris Edward Smith, No. E2004-02272-CCA-R3-CD, 2005 WL 1827848, at *3-5 (Tenn. Crim. App. Aug. 3, 2005). Moreover, despite Howard's claims to the contrary, the Tennessee Supreme Court in Howell held that the right to use peremptory challenges is not a constitutional right:

> It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury, see Wainwright v. Witt, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985), and the use of peremptory challenges is a means to achieve the end of an impartial jury. Ross v. Oklahoma, 487 U.S. 81, 88, 108 S. Ct. 2273, 2278, 101 L. Ed. 2d 80 (1988). However, although the right to exercise peremptory challenges is "one of the most important of the rights secured to the accused," Swain v. Alabama, 380 U.S. 202, 219, 85 S. Ct. 824, 835, 13 L. Ed. 2d 759 (1965), the right to exercise peremptory challenges is not of constitutional dimension. Ross, 487 U.S. at 88, 108 S. Ct. at 2278.
>
> As long as the jury that sits is impartial, the denial or impairment of the right to exercise peremptory challenges does not violate the Sixth Amendment. Id.

868 S.W.2d at 248 (emphasis added).

As we previously concluded, Howard has presented no evidence that the jury that decided his case was not fair and impartial. Therefore, he is not entitled to relief based on his claim that his right to use peremptory challenges was affected. Because the right to use peremptory challenges is not a constitutional right, Howard cannot claim that his denial of the right to use a peremptory challenge to remove Anderson from the jury is a structural error requiring reversal.

Secondly, Howard contends that even if the error is not structural, he is nevertheless entitled to a new trial. He asserts that Anderson's intentional concealment of his association with Moton caused a presumption of bias to arise and that the totality of the circumstances do not indicate the absence of actual prejudice. He claims that the trial court abused its discretion in allowing Anderson to remain on the jury and that "the proper action . . . would have been to simply dismiss [Anderson] and employ an alternate." See Tennessee Farmers Mut. Ins. Co. v. Greer, 682 S.W.2d 920, 923-24 (Tenn. Ct. App. 1984) (holding that the

Chancellor committed reversible error by failing to inform defense counsel that one of the jurors had disclosed that her son worked with the Plaintiff's expert witness and by failing to take action necessary to ensure an impartial jury when two alternate jurors were qualified and available to serve on the jury).

In support of this issue, Howard claims that Anderson is presumed to be biased because he intentionally concealed information regarding his association with Moton during voir dire and that this presumption of bias and impartiality is not rebutted by an absence of actual prejudice when considering the totality of the circumstances. Despite Howard's allegation that Anderson actively concealed his association with Moton, the record shows that Anderson made a full disclosure at the beginning of Moton's testimony and as soon as he realized he worked with Moton. Anderson's almost immediate notification to the court of this association weighs against the likelihood that Anderson intended to willfully conceal his association with Moton. See State v. Taylor, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983) (holding that "the alleged relationship of jurors to people connected with law enforcement, even if true, does not give rise to an inherently prejudicial situation in and of itself"); State v. Joseph Angel Silva, III, No. M2003-03063-CCA-R3-CD, 2005 WL 1252621, at *6 (Tenn. Crim. App. May 25, 2005) ("Tennessee courts have routinely refused relief in post-verdict propter affectum challenges in cases where there was a casual relationship not disclosed during voir dire or the record failed to reveal an inherently prejudicial relationship or a false answer."); State v. Sammy D. Childers, No. W2002-00006-CCA-R3-CD, 2003 WL 214444, at *3 (Tenn. Crim. App. Jan. 30, 2003) (concluding that the defendant failed to establish any bias or partiality by the juror when the evidence showed that the juror did not have a "close acquaintanceship" with the victim). Anderson stated unequivocally, after questioning by the trial court, that he could be fair and impartial. After being able to observe Anderson's demeanor and credibility during its questioning, the trial court determined that Anderson was not disqualified from performing his duties as a juror. See Forbes, 918 S.W.2d at 451. The trial court was convinced that Anderson could be impartial and nothing in the surrounding circumstances or Anderson's conduct indicated otherwise. Upon review, we conclude that the trial court did not abuse its discretion in declining to replace Anderson with an alternate juror during trial and that Howard has failed to present any evidence of actual bias or partiality on the part of Anderson.

**II. Alleged Jencks Violation.** Howard argues that the trial court abused its discretion in denying his motion for a mistrial based on the State's violation of the Jencks Act by failing to produce Detective Jones's second report until the middle of Jones's cross-examination. He asserts that the State failed to exercise due diligence in obtaining the second report and that this Jencks violation prejudiced his cross-examination of Detective Jones.

In response, the State contends that Howard has waived this issue because he failed to make a contemporaneous objection regarding the <u>Jencks</u> violation at trial. Alternatively, the State contends that the trial court did not abuse its discretion in denying the motion for a mistrial because there was no showing of a lack of due diligence on the part of the district attorney's office regarding Detective Jones's second report and because Howard suffered only a delayed disclosure rather than a non-disclosure of this information.

The record shows that Howard had possession of Detective Jones's first report, which was thirteen pages long and contained two of his narrative reports. Prior to trial, Howard filed a motion requesting <u>Jencks</u> material, and he orally renewed this motion at the conclusion of Detective Jones's direct examination, specifically asking for "any <u>Jencks</u> material of this witness, or any supplements[.]" The State responded, "You have everything I have."

During Detective Jones's cross-examination, defense counsel learned that Detective Jones was relying on second report, consisting of a third narrative, that had not been provided to the defense. This report had apparently been generated to aid the detective in his testimony before the grand jury. Defense counsel asked to approach the bench, stating, "I don't know what [Detective Jones] is looking at[,] but I don't have that." When the State responded that this report was provided to defense counsel in discovery, defense counsel replied, "You sure[?]" The trial transcript shows that Howard never objected to the fact that he had not received this second report. In addition, he never asked for a recess to review the undisclosed report and instead continued his cross-examination of Detective Jones. Defense counsel concluded his cross-examination of Detective Jones and then cross-examined two other witnesses for the State. After the close of all proof, the parties presented their closing arguments, and the trial court recessed until the following day.

The next day, defense counsel moved for a mistrial based on the State's <u>Jencks</u> violation in failing to timely disclose Detective Jones's second report at the end of Jones's direct examination. He acknowledged that he had reviewed the State's entire file and had been given a copy of everything the district attorney's office had in its possession regarding this case. The State argued that there was no basis for a mistrial because the district attorney's office never received Detective Jones's second report. The court asked defense counsel if he had a copy of the narrative in question, and defense counsel responded, "I do not your Honor. It was, it was–I did look at it in the middle of my cross-examination. It was kind of thrust upon me at that point. No copy had been made[,] and if Your Honor denies the motion, then I will be asking to [have] his entire file copied and made an exhibit for the purpose of this record. If I need to subpoena that at any future motion for new trial, I can do that." At that point, the trial court denied the motion for a mistrial.

At the hearing on Howard's motion for new trial, defense counsel made Detective Jones's second report an exhibit to the hearing and argued, inter alia, that the failure to produce the second report at the close of Detective Jones's direct examination was prejudicial because there were several statements within the report that contradicted what Detective Jones and other witnesses had testified to at trial. The State responded that because Detective Jones's second report was never in the State's possession, there was no violation of Rule 26.2. The State also asserted that it had requested all relevant materials from Detective Jones, which satisfied the due diligence requirement. In addition, the State argued that defense counsel had the opportunity to cross-examine Detective Jones as well as the victim and Moton, who both testified later at trial, about the contents of the second report. The State argued that if the court determined that this was a Jencks violation, it believed the error was harmless because Detective Jones, the victim, and Moton were all subject to cross-examination regarding this narrative. The trial court determined that there was no merit to this issue and denied the motion for new trial.

On appeal, Howard argues that Detective Jones's second report, which was unquestionably subject to the Jencks Act, contained inconsistent facts that could have been used to impeach Jones's testimony at trial. He also contends that if the report had been disclosed after Detective Jones's direct-examination, defense counsel could have cross-examined the victim and Moton regarding their inconsistent statements to Detective Jones and if they denied making these inconsistent statements, defense counsel could have recalled Detective Jones to introduce extrinsic proof of the inconsistent statements. See Tenn. R. Evid. 613(b); but see State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984) (holding that "material contained in the police report could not be used for the impeachment of a separate witness unless that witness had adopted the statement contained in the report").

A defendant is generally entitled to a witness's statement, upon request, after that witness has testified on direct examination at trial. Jencks v. United States, 353 U.S. 657 (1957). Tennessee Rule of Criminal Procedure 26.2, which is Tennessee's version of the Jencks Act, states:

> **(a) Motion for Production.** After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

**(b) Production of Statement.**

> (1) Entire Statement. If the entire statement relates to the subject matter of the witness's testimony, the court shall order that the statement be delivered to the moving party.
>
> . . . .
>
> **(c) Recess for Examination of Statement.** The court *may* recess the proceedings to allow time for a party to examine the statement and prepare for its use.

Tenn. R. Crim. P. 26.2(a), (b)(1), (c) (emphasis added); see T.C.A. § 40-17-120(a). Pursuant to Rule 26.2, the State has no duty to provide the defendant with a copy of the witness's statement until after the witness had testified on direct examination. State v. Caughron, 855 S.W.2d 526, 535 (Tenn. 1993) (citing State v. Taylor, 771 S.W.2d 387, 394 (Tenn. 1989)).

The State has a duty to exercise due diligence in obtaining a statement and providing it to the defense. State v. Cannon, 661 S.W.2d 893, 899 (Tenn. Crim. App. 1983) (citing State v. Hicks, 618 S.W.2d 510, 514 (Tenn. Crim. App. 1981)). "The prosecutor's duty to disclose extends not only to material in his or her immediate custody, but also to statements in the possession of the police which are normally obtainable by 'exercise of due diligence,' that is, a request to all officers participating in the investigation or preparation of the case." Hicks, 618 S.W.2d at 514 (citations omitted). Sanctions for failing to produce a statement are not dependant on a party's bad faith. State v. Jim Inman, No. 03C03-9201-CR-00020, 1993 WL 483321, at *12 (Tenn. Crim. App., at Knoxville, Nov. 23, 1993). "Intentional withholding or destruction of statements, regardless of motive, may be viewed as a violation of Rule 26.2 for which appropriate sanctions may be applied." Id.

In this case, neither party disputes that the State requested all of Detective Jones's reports, that defense counsel had access to and reviewed the State's entire case file, and that Detective Jones's second report was not within the file. Although Howard argues that the State failed to exercise due diligence in obtaining the second report, on these facts, there is simply nothing to support his claim. Accordingly, we are unable to conclude that the State failed to exercise due diligence in attempting to obtain Detective Jones's second report.

We further conclude, as argued by the State, that Howard has waived this issue because defense counsel failed to make a contemporaneous objection when he received Detective Jones's second report during cross-examination, failed to request a copy of the report during Detective Jones's cross-examination, and failed to request a recess in order to fully analyze the impact of this second report on the case. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or

nullify the harmful effect of an error."); Joseph Angel Silva, III, 2005 WL 1252621, at *10 ("Any error which resulted from the State's oversight in not providing the Defendant with the physical description of the attacker could have been cured by the Defendant."); State v. Timmy Fulton, No. 02C01-9706-CC-00223, 1998 WL 188532, at *4 (Tenn. Crim. App., at Jackson, Apr. 21, 1998) ("The trial court did not abuse its discretion in refusing to grant a mistrial for this violation of Rule 26.2; such a sanction would have been inappropriate where the defense held the keys to negating the effect of the error and chose not to do so.").

Waiver notwithstanding, the record shows that the second report contained information that was, in large part, cumulative to the information in Detective Jones's first report and cumulative to other evidence in the possession of the defense. See e.g., Rosenberg v. United States, 360 U.S. 367, 371 (1959) (holding that the trial court's error in withholding a document to which the defense was entitled pursuant to the Jencks rule was harmless because the information contained in the withheld document was already in defense counsel's possession). Moreover, on these facts, we decline Howard's invitation to explicitly adopt the federal strict harmless error analysis for Jencks violations as suggested in Justice Daughtrey's dissenting opinion in Caughron, 855 S.W.2d at 555-56. We conclude that Howard has failed to demonstrate that the error "more probably than not affected the judgment" or that it resulted in prejudice to the judicial process. Accordingly, the trial court did not abuse its discretion in denying Howard's motion for mistrial. He is not entitled to relief.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE